[No. B125769. Second Dist., Div. Two. June 22, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK GAIO, JR., et al., Defendants and Appellants.

## COUNSEL

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant Frederick Gaio, Jr.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Rick Lynn Hodgin.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar and G. Tracey Letteau, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COOPER, J.—Frederick Gaio, Jr., and Rick Lynn Hodgin appeal from judgments imposed after a jury convicted them, respectively, of three counts each of receiving a bribe (Pen. Code, § 68; undesignated section references are to that code) and giving a bribe with a value in excess of $400 (§ 67.5, subd. (b)). Gaio received a five-year sentence, and Hodgin was sentenced to a term of three years and four months. Appellants also were assessed restitution fines of $1,000 for Gaio and $600 for Hodgin, and direct victim restitution of $21,479.84, payable jointly and severally to Los Angeles County (§ 1202.4, subds. (a), (b), (f)).

Appellants primarily raise contentions of insufficiency of evidence and instructional error, all of which derive from the premise that bribery under sections 67.5 and 68 requires that the bribe have been paid with intent to influence a specific, particular, official act. This premise does not correctly reflect California law, and appellants' contentions to that extent accordingly fail. Nor is there merit in appellants' remaining contentions, that their consecutive sentences violated section 654, and that reversal is required as to Gaio because of erroneous denial of his motion under section 995. We therefore affirm the judgments.

FACTS

Viewed in accordance with the governing rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence at trial showed that between January 1995 and at least February 1996, Hodgin was a broker and salesman, working on commission for several food companies that sold provisions to the County of Los Angeles (county), for meals consumed by prisoners at jail facilities administered by the county's sheriff's department (LASD). During the same period, Gaio held a series of high-ranking positions in the Food Services Department of LASD (food services), which was responsible daily for providing meals to over 21,000 inmates, as well as 5,000 LASD staff meals. Food service's annual budget to purchase food for these meals exceeded $22 million.

From January until mid-March of 1995 (and for many years previously), Gaio was food manager III, in charge of food services at the Men's Central Jail. In mid-March, Betty Starr, food services' new director, elevated him to acting assistant director, just below her. Gaio was formally promoted to that position, after a competitive examination, on July 6, 1995. Under Starr's administration, commencing in January 1995, Gaio participated in preparing

requisitions for food product contracts, to be let out for bid by the county through the purchasing and stores division of its internal services department (purchasing and stores). He also assisted vendors with getting their invoices paid, and received presentations from them about new products they proposed to sell. In addition, Gaio and Starr supervised facility managers' monitoring of suppliers' compliance with contract specifications.

The indictment charged that Hodgin had paid Gaio, and Gaio had received from Hodgin, three bribes: $5,000 in January 1995; $1,500 in March 1995; and "a 1995 Ford Taurus automobile" between July 5 and September 7, 1995. There was no dispute that Hodgin paid Gaio the first two sums, and also made a down payment of $1,500 and two monthly payments of $561.66 each for the lease of a new Taurus for him. The testimonial and documentary evidence further established without question that the funds for these payments emanated from related companies, represented by Hodgin, which sold and sought to sell foodstuffs to the county for LASD. Testifying under grants of use and transactional immunity, respectively, Larry Solomon, president of Joy Foods and vice-president of Infinity Sales in Florida, and Nunzio Moriscato, Las Vegas general manager of Infinity Sales until June 1995 and owner of Infinity Foods and Sundance Foods, described providing Hodgin the funds.

Moriscato, who had known Gaio since 1993, employed Hodgin as a liaison with LASD. In December 1994, Moriscato provided Gaio with a weekend in Las Vegas, at corporate expense. Solomon testified that Moriscato had asked him to pay for the visit, in order to continue selling to the county.

The following month, Hodgin asked Moriscato for $5,000, as an advance against commissions. Hodgin stated he needed the money either to permit him to "continue working" or to get a deal done with the county.[1] Moriscato, in turn, asked Solomon to provide him that sum, for family medical expenses, to be repaid. Solomon wired Moriscato $5,100, of which Moriscato retained $100 for expenses due, and sent Hodgin a check for the remaining $5,000. Hodgin exchanged that check at his bank (American Savings Bank, in Huntington Beach) for a cashier's check payable to Gaio, which Gaio deposited.

In March 1995, Moriscato testified, Hodgin asked him for $1,500, supposedly to buy a computer for someone at the county. Moriscato provided this payment from his own company, Infinity Foods (which he had incorporated to obtain a Nevada business license, Joy Foods and Infinity Sales being

---

[1] At trial, Moriscato gave the first stated reason, although before the grand jury he had recounted the second one. Moriscato was a recovering alcoholic, and he admitted that heavy drinking had impaired his memory.

Florida corporations). On April 4, 1995, Hodgin exchanged the check for one to Gaio. Gaio presented a $1,500 check at his credit union the following day. When Moriscato later became suspicious and told Hodgin he intended to inquire whether the county had received the computer, Hodgin volunteered to repay the $1,500, and did so.

In May or June of 1995, Hodgin informed Moriscato that he needed to get a Ford Taurus for Gaio, in order to get either the "bologna deal" or the "coffee deal" done.[2] Moriscato approached Solomon about acquiring the car for Gaio. Solomon was displeased, but Moriscato said it was necessary in order to continue selling to the county. Hodgin also called Solomon, and said he needed $1,500 to lease a Taurus for Gaio, to "take care of" him. According to Solomon, Hodgin said this was necessary "to continue the relationship, to get our bills paid in a proper time and to continue selling cold cuts and product."

Solomon spoke to Hodgin about the matter more than once, and Hodgin was insistent, stating, "I'm really going to do this for Fred. We're going to get him a leased car." Solomon agreed to provide the car, so as to continue selling his products to the county "[a]nd to get paid on my open invoices." At that time, Solomon had numerous invoices pending with the county; they were being paid slowly, causing delays for both Infinity Foods's income and its payments to its own suppliers. Solomon testified he needed the payments "to be facilitated quickly."[3]

Accordingly, Solomon issued Hodgin an Infinity Sales check for $1,500, for the initial payment on the lease of the Taurus. On July 5, 1995, Hodgin exchanged the check at American Savings for a cashier's check in the same amount, payable to Ed Butts Ford, in La Puente. On the same day, Gaio delivered the check to that dealership, as the initial payment on his lease of a new 1995 Taurus.[4]

Hodgin subsequently phoned Solomon and requested another $560, for the August lease payment. Solomon sent the check. Hodgin cashed it at American Savings and obtained two cashier's checks, for $500 and $61.66,

---

[2]At both the grand jury and the trial, Moriscato admitted uncertainty about which "deal" was mentioned. However, while Infinity Sales's 1995 contract to supply the county cold cuts had already been made by this time, a "coffee deal" for LASD indeed was impending in June 1995, as discussed below.

[3]On cross-examination, Solomon further testified: "Q You felt that maybe if you continued this relationship where you got this relationship going with Mr. Gaio, that perhaps those invoices could get paid more promptly? [¶] A That would be correct."

[4]The salesperson who arranged the lease testified that she had known Hodgin for years, and that he had referred numerous customers to her.

payable to Ford Motor Credit Company, the payee of the lease, on which the monthly payment was $561.66. On August 24, 1995, Solomon issued Hodgin another $560 check, for the September payment. On August 30, Hodgin again obtained $500 and $61.66 cashier's checks payable to Ford Motor Credit. Solomon listed the three payments on his books as reimbursement for broker expenses.

These three lease payments collectively comprised the last of the charged bribes. Thereafter, Solomon testified, he was unwilling to continue paying for the lease, in that the county had awarded a new cold cuts contract to another company, Harvest Farms, which Solomon believed should assume the responsibility. According to Solomon, at a meeting between himself, Hodgin, and Harvest Farms's owner George Callas, Hodgin stated that the lease was his own responsibility, and he would handle it.[5]

Solomon recounted that from January 1995 until his company's contract with the county expired that summer, Gaio assisted them "in walking through the invoices to get paid on a quick basis." Gaio also assisted by authorizing substitutions of cold cuts different from those called for by the existing contract (e.g., turkey salami for turkey breast), such substitutions being occasioned by shortages from Harvest Farms, which was then Solomon's own supplier.

The evidence also indicated that Gaio sought to assist Infinity Sales and Harvest Farms, as represented by Hodgin, with respect to two transactions for the purchase of coffee and cookies for LASD. First, in June 1995 food services presented purchasing and stores a requisition for approximately $800,000 in coffee. The coffee was to be supplied in large flow-through bags, rather than in drums as before. Christine Varnes, manager of purchasing and stores, testified that Gaio told her that the only vendor that could supply the coffee in this form was Coffee Connection, a company from and for which Moriscato and Infinity Sales bought and sold. LASD's requisition listed Coffee Connection, represented by Hodgin, as a "reference vendor," i.e., one to which purchasing and stores could look. It also bore Gaio's name as contact person. The contract was let out for bid and was won by another company, after the bid submitted by Coffee Connection and Infinity Sales came in substantially higher, and their product failed a comparison test.

The cookie transaction arose from an emergency, after the LASD's bakery's ovens failed in the beginning of January 1996. Cookies, ordinarily produced by that bakery, were an important part of the caloric menu content

---

[5]Callas testified that after Hodgin in September 1995 became a representative for Harvest Farms, he asked Callas to lease cars for both himself and Gaio.

for inmate lunches. Food services director Starr accordingly decided to requisition an outside purchase of Keebler cookies for the rest of the fiscal year, in the amount of $200,000. A purchase of that size, however, required bidding. Purchasing and stores directed food services to provide a requisition, for formal bidding, and to obtain three oral bids, based on which an interim, emergency purchase could be made through LASD's "various vendors" authority. The initial requisition, which showed Gaio as the contact person, listed Harvest Farms as the low bidder at $17.20 a case, and Joy Foods and Sundance Foods (Moriscato's company), both at $17.50. Moriscato testified that he hadn't had access to the cookies, but had provided a bid in order to assist the county. Solomon testified that neither he nor his company had been asked to supply a quote (although he had sold Keebler cookies to the county the year before). At this time Hodgin was working for Harvest Farms. Starr testified she had called him for its bid, while telling Gaio or another subordinate (who denied receiving the assignment) to get the other two bids.

The $200,000 cookie purchase ultimately was abandoned. However, purchasing and stores did authorize the emergency interim purchase, for two weeks in January 1996. Several such purchases were made, from Harvest Farms, but they continued to mid-February of 1996, beyond the authorized term. Harvest Farms invoiced over $67,000 for these orders.

In December 1996 and again in November 1997, Gaio was interviewed by investigators from LASD's internal criminal investigations bureau. The second interview occurred after search warrants had been executed at his home, car, and office. On each occasion, he denied having received anything of value from Hodgin. Interviewed in December 1997, Hodgin similarly denied giving any gifts or money to Gaio.[6] Hodgin's telephone records showed 239 after-hours and weekend calls to Gaio's home during 1995, and 34 in 1996, 21 of them in January (the month of the cookie emergency).

Hodgin did not present an affirmative defense. Gaio was the principal witness in his own defense. He testified that as of 1994 he had been in financial straits, his wages having been garnished to pay income tax arrears stemming from his withdrawal of retirement funds for a failed restaurant venture. Unable to borrow commercially, he sought to do so from Salvador

---

[6]These false statements were admitted only with respect to the respective declarants. In addition, in 1997 Solomon encountered Gaio at a food show, after LASD investigators had interviewed Solomon's employees. Solomon asked if Gaio was aware of the investigation, and Gaio responded, "There is nothing here. They have nothing. There is no evidence. Just keep your mouth shut."

Garcia, a food services cook, and from Hodgin, a friend.[7] Gaio accounted for the $5,000 payment of January 1995, which his bank records showed had been quickly spent, as a loan, to cover bills and to entertain his visiting daughters. He claimed to have signed and given Hodgin a document in the nature of a promissory note, but it was not produced.

Gaio also admitted accepting the March 1995 payment and the car payments, which he claimed were added to the loan amount. He had not repaid any of the "loan" as of the time of trial (June 1998). He denied doing anything special for Hodgin, and specifically denied telling Varnes that Coffee Connection was the only available source for the bagged coffee. With respect to the cookie bids, Gaio insisted he had spoken to Solomon about the county's need, and had obtained prospective prices from him and from Moriscato.

Gaio admitted helping Hodgin expedite payments for his vendors, but stated, "Not any more than I helped anybody else who needed it." He acknowledged allowing Infinity Sales in 1995 to substitute various cold cuts for those required under its contract with the county, but averred that the substituted goods were paid for at their own prices. He also acknowledged that even before Starr became director of food services, he would review sample products provided by Hodgin, and sometimes would bring them to Starr's predecessor and explore their potential utility and pricing. Gaio testified he had lied to the investigators about Hodgin's payments out of fear and shame.

DISCUSSION

1. *Sufficiency of Evidence.*

Gaio contends that the evidence on each of the three counts against him was insufficient to establish the necessary elements of the offenses. Hodgin presents a similar contention, but only with respect to counts 2 and 4, which respectively concerned the January and March 1995 payments. The primary basis of these contentions is that the respective bribery offenses required proof that the payments to Gaio were made in exchange for, or to influence, specific official acts. Building upon this premise, appellants contend that the evidence did not establish that Hodgin's payments to Gaio were given and accepted in contemplation of a specific quid quo pro. As we now explain, appellants' sufficiency-of-evidence arguments lack merit. The legal premise underlying them is not a valid statement of California law.

---

[7]Garcia confirmed that on various occasions Gaio had borrowed, and repaid, as much as $2,000 from him.

Section 68, under which Gaio was charged and convicted, makes it a felony for any state, county, or city officer or employee to ask, receive, or agree to receive, "any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby . . . ." Section 67.5, under which Hodgin was convicted, criminalizes the giving or offering of a bribe to any state, city, or county ministerial officer or employee, the offense being either a misdemeanor or a felony, depending on whether theft of the thing given as the bribe would be petty or grand theft. Section 7, subdivision 6, further defines "bribe" as "anything of value . . . , asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." This definition applies to both section 67.5 and, somewhat redundantly, section 68. (See *People v. Longo* (1953) 119 Cal.App.2d 416, 417-418 [259 P.2d 53]; cf. *People v. Diedrich* (1982) 31 Cal.3d 263, 272, fn. 5 [182 Cal.Rptr. 354, 643 P.2d 971]. (*Diedrich*).)

█ Collectively, then, the statutes thus define bribery as the giving or receipt of something of value, with the intent that the recipient be influenced in his or her vote, action, or opinion, in an official capacity (and in the case of the recipient with respect to "any matter then pending or which may be brought before him . . ." (§ 68)).[8]

Diedrich, *supra,* 31 Cal.3d 263, establishes that these proscriptions are not dependent on identification of a specific official act as the object of the bribe. *Diedrich* involved convictions of a county supervisor on two counts of bribery, in violation of section 165, by a developer that was seeking to have its property released from an agricultural preserve agreement.[9] The proof on count I showed that in March 1974, the developer had indirectly provided the supervisor with benefits, and the supervisor contemporaneously had prepared a resolution and agreement by which the board of supervisors released the property from the agricultural preserve, but with the proviso that the developer later dedicate an easement to certain unspecified acreage, to be

---

[8]Although section 68 speaks of the recipient's "agreement or understanding" to be influenced, that language connotes not an extrinsic agreement with the giver but rather the recipient's own intent. The corrupt intent of the recipient (or of the giver, in the case of giving a bribe) need not be reciprocated. (See *Diedrich, supra,* 31 Cal.3d at pp. 273-274; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Governmental Authority, § 1163, p. 1343.)

[9]Section 165 addresses bribery of county supervisors, city council members, and similar members of local elective bodies. Its explicit terms closely resemble those of section 68 and section 67.5, as read in conjunction with section 7, subdivision 6. Moreover, the latter definition of bribe applies to section 165 as well. (*Diedrich, supra,* 31 Cal.3d at p. 272, fn. 5.) The several statutes merit a like construction. Indeed, in the portion of *Diedrich* discussed immediately below, the Supreme Court when applying section 165 relied heavily on a case that had been brought under section 68 (*People v. Markham* (1883) 64 Cal. 157 [30 P. 620]).

approved by the board in the future. Count II charged that the supervisor had received another bribe on December 31, 1974, and the evidence showed that on that date he had received $20,000, indirectly from the developer. The supervisor contended that the evidence on count II was insufficient because no specific action regarding the developer's land had been pending before the board of supervisors on December 31, 1974.

Rejecting this contention, the Supreme Court stated: "The law does not require any specific action to be pending on the date the bribe is received. Penal Code section 165 prohibits asking or receiving a bribe to effect the consideration '. . . of any question or matter, upon which [a person named by the statue] *may* be required to act in his official capacity, . . .' (Italics added.) The use of the word 'may' suggests that payments designed to alter the outcome of any matter that could conceivably come before the official are within the prohibition of the statute." (*Diedrich, supra,* 31 Cal.3d at p. 276.)

The court proceeded to explain that "In this case, there is ample evidence of matters that might have come before the board of supervisors: (1) zoning approvals for housing tracts to be developed, (2) allocation of gas tax for building roads in the area, (3) use of open space for orchards, and (4) sale of land needed for a flood plain to the county. Evidence concerning each of these issues was received at trial." (*Diedrich, supra,* 31 Cal.3d at p. 276.) Furthermore, the court observed, the developer was obligated to dedicate acreage to the county in 100-acre lots, annually between 1976 and 1981, and the supervisors retained discretion to decide the suitability of the land the developer would in the future so offer. This approval too—as to which the board had not taken action at the time of trial—also "was a matter that *might* come before Diedrich in his official capacity." (*Id.* at p. 277.)

*Diedrich* thus both declares and demonstrates that bribery does not require that a specific official action be pending when the bribe is given, or that there be proof that the bribe was intended to influence any particular such act. Rather, it is sufficient that the evidence reflect that there existed subjects of potential action by the recipient, and that the bribe was given or received with the intent that some such action be influenced.

Essentially the same point was made, albeit to a different end, in *People v. Megladdery* (1940) 40 Cal.App.2d 748 [106 P.2d 84], a decision much cited by Hodgin. Rejecting a contention that the subject of the bribe need be specifically imposed by law as a duty of the official, the court stated, "It is sufficient to charge and prove that the subject matter upon which the bribe was to operate existed and could be brought before the public officer in his

official capacity." (*Id.* at p. 782.) A standard jury instruction—presently CALJIC No. 7.10 (6th ed. 1996)—restates this principle, and in *People v. Finkelstin* (1950) 98 Cal.App.2d 545, 560 [220 P.2d 934], the court approved its rendition, in context, with the general pronouncement that "Whether a chief of police will enforce the law against social vices is always before him."

Appellants' contention that a bribe must be tied to a specific official action derives from an entirely different and distinguishable source, namely the United States Supreme Court's recent interpretation of a federal "gratuity" statute. In *United States v. Sun-Diamond Growers of Cal.* (1999) 526 U.S. 398 [119 S.Ct. 1402, 143 L.Ed.2d 576] (*Sun-Diamond*), the court construed 18 United States Code section 201(c)(1)(A), which criminalizes the giving of a thing of value "for or because of any official act performed or to be performed by" a federal public official. The court held that "to establish a violation of [the statute], the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." (*Sun-Diamond, supra*, at p. 414 [119 S.Ct. at p. 1411].) In so ruling, the court rejected the argument that the statute " 'reaches any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be in a position to act favorably to the giver's interests.' " (*Id.* at p. 405 [119 S.Ct. at p. 1407], italics omitted.)

The court based its conclusions primarily on an analysis of the statutory structure and text. Title 18 United States Code section 201(a)(3) sets forth a definition of "official act," for purposes of the federal statute, that is itself particularized—"the term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy . . . ." This definition intrinsically indicates a specific nexus for the prohibited payment, and the court reflected that "The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." (*Sun-Diamond, supra*, 526 U.S. at p. 406 [119 S.Ct. at p. 1407].) Moreover, the court somewhat conclusionally perceived the statutory phrase "for or because of any official act performed or to be performed" (18 U.S.C. § 201(c)(1)(A)) to signify " 'for or because of some particular official act of whatever identity,' " as opposed to " 'for or because of official acts in general, without specification as to which one' . . . ." (*Sun-Diamond, supra*, at p. 406 [119 S.Ct. at p. 1407].)

We perceive no compulsion to rule, by analogy to *Sun-Diamond,* that the subject of a bribe under the California statutes at issue in this case must be a specific official act. Contrary to Gaio's analysis, the federal and California

bribery statutes are not "nearly identical." Like the gratuity subpart that was at issue in *Sun-Diamond*, the bribery provisions of 18 United States Code section 201 incorporate the focused definition of "official action" on which the *Sun-Diamond* court placed emphasis, but which nowhere appears in section 7, 67.5, or 68. (Cf. *State v. Lopez* (Fla.Dist.Ct.App. 1988) 522 So.2d 997, 998-1000.)

Moreover, as explained above, *Diedrich, supra,* 31 Cal.3d 263, compels the opposite conclusion. Although the United States Supreme Court in *Sun-Diamond* perceived a requirement of specific official action in the statutory language "any official action" (*Sun-Diamond, supra,* 526 U.S. at p. 406 [119 S.Ct. at p. 140]), the California Supreme Court in *Diedrich* focused on "[t]he use of the word 'may' " and concluded that "payments designed to alter the outcome of any matter that could conceivably come before the official are within the prohibition of the statute." (*Diedrich,* at p. 276.)

The United States Court of Appeals for the Ninth Circuit recently reached a like conclusion regarding the requisites of California bribery law, as contrasted with the federal elements discerned in *Sun-Diamond, supra,* 526 U.S. 398. In *U.S. v. Frega* (9th Cir. 1999) 179 F.3d 793, an attorney had been convicted of a violation of 18 United States Code section 1962(c), predicated on bribery of judges, as proscribed by sections 92 and 93 in language similar to that of sections 7, 67.5, and 68. He contended that the indictment had been defective "because it failed to identify specific decisions or acts that he corruptly intended to influence by his financial generosity to the judges." (*Frega, supra,* 179 F.3d at p. 805.) The court disagreed. Drawing on the analysis in *Diedrich, supra,* 31 Cal.3d at page 276, the court declared, "Linkage between a payment and a specific official decision is not required under California bribery law." (*Frega,* at p. 805, fn. omitted.) In an accompanying footnote, the court distinguished *Sun-Diamond, supra,* 526 U.S. 398, and the federal statute it had interpreted.

■ Accordingly, notwithstanding appellants' contentions, proof of the offenses in this case did not require that each bribe have been given and received with intent to influence a specific official act by Gaio. The evidence was sufficient if it established that Gaio received Hodgin's payments, and Hodgin made them, with the intent (or agreement or understanding, see fn. 8, *ante*) that Gaio be influenced in any one or more instances, types, or courses of official action. And the evidence did establish that, albeit necessarily circumstantially (neither appellant having owned up to the corrupt intent). (See *People v. Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].)

The evidence showed that throughout the period in which Hodgin made the payments to him or for his benefit, Gaio occupied positions that enabled

him to assist Hodgin's client, Infinity Sales, both to obtain prompt payment of its invoices under a contract with the county for LASD, and to make substitutions for specific foodstuffs that contract required. Solomon testified that Hodgin proposed, and he agreed to, the car lease for the purpose of obtaining Gaio's expediting Infinity Sales's invoices, and that Gaio had performed that service beginning at least in January of 1995. Gaio did not deny, and in fact admitted, that he had assisted Hodgin and Infinity in this way, as well as with the product substitutions. It is plainly inferable that appellants engaged in the various payments with the intent that Gaio be influenced to do so.

Another matter within the potential contemplation of Gaio, Hodgin, and Hodgin's principals was the so-called coffee deal, LASD's $800,000 requisition of specially bagged coffee in June 1995. As previously noted, Moriscato testified that Hodgin may have requested the Taurus for Gaio in order to get this deal done. In addition, Moriscato testified that for several years before the June 1995 coffee requisition, he and Coffee Connection had been working to develop the flow-through bag for presentation to LASD, and also that he and Hodgin had been attempting for several years to secure a contract for Coffee Connection to supply coffee to LASD. The jury therefore could have concluded that not only the auto lease, but also one or both of the other two payments, provided by Hodgin and facilitated by Moriscato, were given with the intent to influence Gaio with respect to that matter in 1995.[10]

Finally, it was established that Gaio's duties included ordering food for the central jail, and participation in the preparation of product specifications and requisitions for purchasing and stores' food purchases for LASD. During the "cookie crunch" of early 1996, Gaio accordingly was involved in a purchase of cookies, much of it unauthorized, from Harvest Farms, to which Hodgin had then moved. The cookie purchase arose from an unanticipated emergency in 1996, and so the 1995 payments cannot be specifically linked to it. However, the relationship between Gaio and Hodgin, as well as the latter's knowledge of the former's position and capacities, would justify an inference that one or more of the payments was made and accepted with the intent that Gaio be influenced to favor Hodgin and his principals with respect to specifications, requisitions, and other recommendations for bidding and purchasing, such as on this occasion.

---

[10]On cross-examination and before the grand jury, Moriscato testified that Hodgin's request for the January 1995 payment could not have been for the coffee deal, because that deal did not arise until later in the year. This testimony does not foreclose the possibility that Hodgin made the payment to Gaio, and Gaio accepted it, with a view toward, among other things, LASD's forthcoming coffee requisitions. (Cf. *Diedrich, supra,* 31 Cal.3d at pp. 276-277.)

We conclude that the evidence was amply sufficient to justify appellants' convictions on all of the counts.

2.  *Jury Instructions.*

Appellants contend that the trial court erred in two respects by failing to instruct the jury sua sponte. Both contentions derive from appellants' incorrect assumption that bribery requires identification of the payment with a specific official action, and both accordingly lack merit.

First, Gaio argues straightforwardly that the court should have instructed that bribery under section 68 requires a link between the acceptance of the bribe and a specific official action. As already discussed at length, this is not a correct statement of the law, and the court was not at fault in failing to expound it. The court properly instructed, in accordance with CALJIC No. 7.02, that proof that Gaio violated section 68 required that his "receipt of a bribe was upon an agreement or understanding that his official action would be influenced thereby."

Second, appellants both contend that the court, on its own motion, should have instructed that the jury had to agree unanimously as to the particular act constituting the offense. (E.g., CALJIC No. 17.01.) Gaio argues that such an instruction should have been given with respect to all three counts with which he was charged; Hodgin assigns the error only with respect to count 6, involving the Taurus payments. Appellants contend that the instruction was necessary because the evidence reflected—and the prosecutor argued—several possible objects or objectives of influence by the bribes, such as help with open invoices, authorization for product substitutions, and favorable treatment in the coffee and cookie transactions.

At bottom, this contention too derives from the premise that the offense of bribery requires, and includes as an element, that a specific, identified act, be the intended subject of influence by the bribe. Once more, that is incorrect. Bribery involves a "payment[] designed to alter the outcome of any matter that could conceivably come before the official . . . ." (*Diedrich, supra,* 31 Cal.3d at p. 276.) A large number of such matters may provide alternative predicates for the offense. (See *id.* at pp. 276-277.) It is the payment, or the agreement to provide payment, that constitutes the criminal act, and that, not the possible object of influence, is what must be found unanimously.

*Diedrich, supra,* 31 Cal.3d 263 illustrates this. In *Diedrich,* the Supreme Court reversed one of the supervisor's two convictions of bribery because of failure to give a unanimity instruction. The count so reversed was not the

one that had been based on a payment potentially directed at a number of different official actions, after release of the land from the agricultural preserve. Rather, the court found that the evidence had shown two separate acts of bribery with respect to count I, involving the developer's effort to influence the supervisor-defendant to obtain that release. The supervisor and his accomplice had first offered to sell land to the developer, and the supervisor thereafter had recommended that the developer hire the supervisor's attorney, who had proceeded to make payments for the supervisor's benefit. The Supreme Court concluded that the evidence of these two transactions—both aimed at influencing a single official act (release of the land from the preserve)—established "two distinct violations of section 165 . . . ." (*Id.* at p. 280.) The People should have been required to elect between them, and failing that, the jury have been directed to decide unanimously which one constituted the offense.

Here, there was no such necessity for election or unanimity. Each count charged a single violation of section 68 or 67.5, accomplished by separate, unique payments. The payments, with corrupt intent, constituted the offenses. What particular official action or actions each was intended to influence did not define the offenses, and it was unnecessary for the jury to agree on that matter.[11]

### 3. *Multiple Punishment.*

■ Appellants both received consecutive sentences for their three respective convictions. They contend that separate punishment for each of the bribes violated section 654, and that the sentences must be corrected accordingly. This contention also lacks merit.

At the time of the offenses, section 654 provided in relevant part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." (Stats. 1977, ch. 165, § 11, p. 644.) In this case, of course, all of the bribes involved separate

---

[11]Counts 5 and 6, concerning the Taurus, each involved three lease payments. Hodgin's unanimity argument is that the evidence on count 6 proved several objects of those payments. His reply brief, however, also states: "If payment alone is the criminal act, as respondent suggests, then appellant could have been found guilty as to count 6 based on three different and separate payments made over a five month period of time for different purposes . . . ." We do not perceive Hodgin thus to be arguing that the jury should have been required to find unanimously that one of the three lease payments constituted the offense charged in count 6. Indeed, later in his reply brief, Hodgin acknowledges that a single count of bribery may arise from multiple payments. Moreover, count 6 identified the car, not the payments, as the bribe.

criminal acts. However, in what it has termed a " 'judicial gloss' " on the statute's language (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211 [23 Cal.Rptr.2d 144, 858 P.2d 611]), the Supreme Court has long applied section 654 to preclude multiple punishment where multiple acts, or offenses, were committed incident to a single intent and objective. The court has adhered to this interpretation even while recognizing that it functionally detracts from the purpose of section 654, which is " 'to insure that a defendant's punishment will be commensurate with his culpability.' " (5 Cal.4th at p. 1211; see *id.* at pp. 1207-1216.)

Appellants contend that separate sentencing was impermissible because all of the bribes were paid and received pursuant to a single intent and objective. (Cf. *People v. Jimenez* (1992) 11 Cal.App.4th 1611, 1623-1625 [15 Cal.Rptr.2d 268] [multiple perjury convictions, but not multiple punishments, permissible for two false statements at defendant's initial trial].) But this is neither necessarily nor demonstrably so. Appellants rely on the prosecutor's summations, in which he sought to associate the bribes, sometimes overlappingly, with a variety of objects, such as prompt payment of invoices, approval of product substitutions, assistance with the coffee deal, and Gaio's general inclination to assist Hodgin and his clients in future matters, such as the cookie situation. But these objectives were not identical, and the jury could have found that each of the bribes was paid and received to achieve one or another of them—not necessarily all (or the same assortment). When the trial court imposed consecutive sentences, it impliedly found that appellants had entertained multiple objectives with respect to the several counts and bribes, and substantial evidence supports that determination. (Cf. *People v. Osband* (1996) 13 Cal.4th 622, 730-731 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

Moreover, even were we to consider the bribes as having all been paid with the single generalized intent and objective of influencing Gaio to favor Hodgin in official matters that Gaio was empowered to affect, separate sentencing was still permissible. Under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 [105 Cal.Rptr. 681, 504 P.2d 905]; see, e.g., *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253-1254 [75 Cal.Rptr.2d 40].) This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. (See *Kwok, supra*, 63 Cal.App.4th at pp. 1255-1256.) Here, the three bribes occurred months apart, and the

giving and receipt of each arose separately. Appellants were properly eligible for sentencing for each such offense.

### 4. Gaio's Motion Under Section 995.

Gaio finally contends that the trial court committed reversible error in denying his motion, under section 995, to set aside the indictment on grounds of lack of probable cause. This contention is unavailing for several reasons.[12]

Gaio's position is that the evidence before the grand jury did not substantiate that he received the payments from Hodgin with an intent to be influenced in performing official acts. To some extent, this argument appears predicated on the supposed requirement that each payment be tied to a specific act. In that respect, it fails because the underlying legal premise is incorrect. Insofar as Gaio more generally contends that there was insufficient evidence of his intent, he is also incorrect. ■ An indictment must be supported by probable cause, as traditionally defined. (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1029 [13 Cal.Rptr.2d 551, 839 P.2d 1059].) The elements of the offense may be established circumstantially. (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 [6 Cal.Rptr.2d 242].) Here, the grand jury received evidence of the payments, their source, Moriscato and Solomon's own purposes, Gaio's participation in the coffee and cookie incidents, his false statements to the investigators, and other facts circumstantially relevant to his intent. The evidence as a whole was sufficient to establish the element of intent under section 68.

Furthermore, even had the section 995 motion been well taken, its denial would not justify reversal of the judgment. ■ Although irregularities in grand jury proceedings may give rise, without more, to appellate relief by pretrial writ, a conviction after trial will not be reversed for such error without a showing that the error actually prejudiced the defendant or deprived him of a fair trial. (*People v. Towler* (1982) 31 Cal.3d 105, 123 [181 Cal.Rptr. 391, 641 P.2d 1253]; see *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530 [165 Cal.Rptr. 851, 612 P.2d 941].) Gaio cannot make such a showing here, because the evidence at trial was sufficient to support his convictions. (*People v. Crittenden* (1994) 9 Cal.4th 83, 136-137 [9 Cal.4th 579b, 36 Cal.Rptr.2d 474, 885 P.2d 887].)

---

[12]Gaio sought pretrial relief from the section 995 denial by petition for writ of prohibition, which we denied. At his request, we take judicial notice of the record of that proceeding. (Evid. Code, §§ 452, subd. (d), 455, subd (a).)

## Disposition

The judgments are affirmed.

Nott, Acting P. J., and Mallano, J.,* concurred.

Appellants' petitions for review by the Supreme Court were denied October 3, 2000.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.