Filed 8/19/14  P. v. Jordan CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA056027) |
| v. | |
| RICKY TYREE JORDAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bernie C. Laforteza, Judge.  Affirmed as modified.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

In the underlying action, appellant Ricky Tyree Jordan was convicted of several offenses, including two counts of criminal threats and one count of stalking. After identifying one of the criminal threats counts as the principal count, the trial court imposed unstayed consecutive terms on the stalking count and the remaining criminal threats count. Appellant contends the imposition of unstayed punishment for those offenses contravened Penal Code section 654.[1] In addition, respondent maintains that the court failed to order certain mandatory fees. We conclude that the court correctly imposed unstayed punishment on the stalking and criminal threats counts, but erred in failing to order the fees respondent has identified. We therefore modify the judgment to correct that error, and affirm it as modified.

## RELEVANT PROCEDURAL HISTORY

On May 18, 2012, an information was filed, charging appellant Ricky Tyree Jordan with several offenses against Tiana Polar. The information alleged in count 1 that between April 1 and 2, 2012, appellant engaged in stalking (§ 646.9, subd. (a)); in count 2, that on April 19, 2012, he made criminal threats (§ 422, subd. (a)); in count 3, that on January 2, 2012, he inflicted corporal injury on a spouse, cohabitant, or child's parent (§ 273.5, subd. (a)); in count 4, that on April 8, 2012, he made criminal threats (§ 422, subd. (a)); and in counts 5 and 6, that on April 19 and 22, 2012, he engaged in criminal vandalism (§ 594, subd. (a)). Accompanying counts 1 through 4 were allegations that he had suffered three prior convictions for purposes of the "Three Strikes" law (§§ 667, subds. (b) - (i),

---

[1] All further statutory citations are to the Penal Code.

1170.12, subds. (a) - (d)), and had served a prison term (§ 667.5 subd. (b)). ~CT 34)~ Appellant pleaded not guilty and denied the special allegations.

The trial was bifurcated regarding appellant's prior convictions. At the beginning of trial, the information was amended to allege that the crime of stalking (count 1) was committed between April 1 and 25, 2012. Appellant pleaded not guilty to the amended information and denied the special allegations. Later, following the presentation of the prosecution's case-in-chief, count 6 was dismissed, and the information was amended to allege that the crime of stalking (count 1) was committed between April 8 and 25, 2012.

A jury found appellant guilty as charged in counts 1, 2, 4, and 5. The jury also found him guilty of simple assault, as a lesser included offense of the crime charged in count 3. After appellant admitted the prior conviction allegations, the trial court struck two of his three prior "strikes" under the Three Strikes law and dismissed the prison term allegation. In addition, the information was amended to include allegations that appellant had two prior convictions within the meaning of section 667, subdivision (a), and appellant admitted those allegations.

In sentencing appellant to a total term of imprisonment of 20 years and two months, the trial court selected count 2 (the April 19, 2012 criminal threats) as the principal count, imposed the upper term of three years, doubled that term pursuant to the Three Strikes law, and added a five-year enhancement (§ 667, subd. (a)). Regarding count 1 (the offense of stalking between April 8 and 25, 2012) and count 4 (the April 8, 2012 criminal threats), the trial court declined to stay punishment (§ 654). On each count, the court imposed a consecutive term of eight months (one-third of the middle term) and doubled that term pursuant to the Three Strikes law; furthermore, on count 4, the court added a five-year enhancement (§ 667, subd. (a)). In connection with the remaining offenses, the court also

3

imposed unstayed consecutive punishment, namely, six months on count 3 (the assault), and 1 year on count 5 (the vandalism).

## FACTS

A. *Prosecution Evidence*

The key prosecution witness was Polar, who testified as follows: In 2011, Polar worked for the Los Angeles County Housing Authority as a housing inspector, and lived in an apartment in Lancaster with her two pre-teenage children. Prior to August 2011, when appellant moved into Polar's apartment, they had been in a romantic relationship for more than two years. She became pregnant, but suffered a miscarriage in October 2011. Following the miscarriage, her relationship with appellant deteriorated, and they had many nonphysical arguments. In late 2011, after Polar and appellant decided to break up, she gave her landlord a 30-day notice in order to move out of the apartment at the end of January 2012.

On January 1, 2012, appellant accidently left his wallet in her car, and became upset when he was unable to contact her to retrieve it. The following day, while Polar cooked breakfast, appellant argued with her regarding the incident. During the argument, appellant pushed Polar's face against the top of the stove. Polar ran upstairs, where appellant followed her, pushed her down on a bed, and began strangling her. When he noticed that Polar's daughter had entered the room, he stopped. Polar told him to leave the house, and he did so. Although Polar did not report the incident, police officers soon appeared at her door, and she talked to them regarding it.

Later, in January and February 2012, Polar's relationship with appellant continued to include some sexual contact. She moved in with her parents, but

4

sporadically slept in her apartment until the end of January 2012. There, she sometimes saw appellant, who also had access to the apartment. According to Polar, her sexual relationship with appellant ended in February 2012.

In late February or early March 2012, when Polar moved into a new apartment, she did not tell appellant because she feared him. In March 2012, appellant began making up to 30 phone calls per day to her. During the phone calls, he engaged in "yelling and screaming," and told her that he would "show up wherever [she] was." In an effort "to diffuse the situation," Polar occasionally visited the barbershop where appellant worked, and sometimes called him in response to his phone messages. She also encountered him at a restaurant they frequented.

In April 2012, appellant began appearing without invitation at Polar's workplace and apartment, even though she had not disclosed the apartment's location to him. On April 8, Polar and her children were celebrating Easter at the home of the children's grandmother. Uninvited, appellant arrived at the home, bearing Easter baskets for the children. In an effort to reject the baskets without causing "a scene," Polar spoke to appellant outside the home. During their conversation, appellant took a ham from the back seat of Polar's car and threw it at her. Later that day, appellant phoned Polar, and left the following message: "I'll be at your job in the morning 'cause I'm off and I'm going to have my home girl . . . , so you're going to get your ass whooped in front of your job. . . . It's over for you. Fuck your life. This bitch is going to beat the shit out of you, nigga. This is a real gang banger. She is going to beat the dog shit out of you." Following the April 8 incident, Polar obtained a temporary restraining order and took other safety precautions.

5

From April 9 to 25, 2012, appellant continued to leave numerous phone messages for Polar, recordings of which were played for the jury. The messages stated that appellant's "home girl" would "fuck [Polar's] ass up" if she did not stop playing "hardball"; that he had been "pushing this Crip shit since motherfucking '87"; that "once [he] g[ot] out of the car and start[ed] whooping [Polar's] ass . . . , [she would] know what's it about;" and that he was "going to fuck with [her] kids." Appellant also stated his "home girl" had made a complaint regarding Polar to her employer, and that he could fabricate a "[good story]," namely, that Polar smoked "weed" while making house inspections. According to Polar, someone later called her employer and made a complaint. She also testified that appellant's threats and references to gangs made her extremely fearful.

At approximately 9:30 p.m. on April 19, Polar was in her apartment when she heard appellant calling her name from the apartment parking structure. From her window, she saw appellant pouring something on her car, and heard a cracking noise. She called 911 and went to the parking structure, where she discovered that appellant had poured detergent on her car and broken off its windshield wipers. After Los Angeles County Deputy Sheriff Dustin Carr arrived at the structure, appellant made a phone call to Polar, of which Carr recorded a portion. According to Polar, appellant said that he was going to shoot her. During the recorded portion of the call, appellant stated, "You see what my home girl did to your car[,] bitch." Later, appellant said, "[I]f you with the police, I'm going to shoot at you too bitch, so if the police pull up[,] I'm busting." Polar understood the call to mean that he would shoot the police and her if she "sen[t] the police." She further testified that the call made her fearful.

On April 22, Polar discovered the word "liar" scratched on her car. On April 25, appellant left phone messages that a "red card" had been placed on a car

6

at her workplace. Polar found the card, which contained a letter from appellant. The letter stated that appellant's sister was concerned regarding Polar's safety, and advised her to "watch [herself]" in her apartment. Polar was frightened by the letter. She quit her job and moved out of California.

Deputy Sheriff Carr testified that after 10:00 p.m. on April 19, 2012, he responded to a call regarding Polar. After locating Polar in her apartment's structure, he saw that someone had torn off her car's windshield wipers and poured detergent on its windshield. While Carr examined the car, Polar received a phone call that Carr overheard. After the caller said that he had a gun and asserted, "I'll get you, bitch," Carr began to record the call.

LeJean Walker testified that on April 19, 2012, he worked as a security guard at Polar's apartment complex. After learning that Polar's car had been vandalized, he spoke to Polar, who described appellant and her temporary restraining order against him. Shortly after, while conducting a patrol, Walker saw appellant driving a car off the apartment complex property. Approximately 20 minutes later, appellant reappeared on foot outside the complex's gated entrance. When Walker told appellant that he was not permitted on the property due to Polar's restraining order, appellant entered his car and drove away.[2]

_____

[2] Aside from these witnesses, Shawn Kent, Polar's former co-worker, testified that in January 2012, he saw bruises on her neck. Later, at some point between January and April 2012, appellant appeared at Kent's and Polar's workplace, asked to see Polar, and placed some groceries in her car. Polar did not appear to want the groceries, and she removed them from the car. Following the incident, Polar's employer permitted her to park close to her workplace entrance. Subsequently, Kent found a letter addressed to Polar on a car parked near her workplace, and gave it to Polar.

B. *Defense Evidence*

Thomas Brown testified that he operated the barbershop at which appellant worked as a barber. According to Brown, from January to April 2012, Polar visited appellant at the barbershop approximately 10 times.[3]

James Jones III and his girlfriend, Gabrielle Monroe, testified that on April 16, 2012, they were socializing with appellant at Medrano's Restaurant. There, appellant requested that Monroe use her cell phone to send to Polar a photo of him and another female. Appellant made the request in a friendly manner, and characterized the photo as a "joke." As Jones, Monroe, and appellant were preparing to leave the restaurant, appellant noticed that Polar was also present and went to speak with her.[4]

Damion Smith testified that he had known appellant since 2006, and visited appellant and Polar while they lived together. According to Smith, after appellant and Polar broke up, he saw Polar at appellant's apartment several times. On those occasions, appellant and Polar acted like "a party couple," were "always together," and watched sporting events. Smith also saw Polar make one or two visits to appellant's barbershop, including a visit in April 2012. Smith further testified that on April 19, he and appellant were together in a nightclub from 9:00 to 10:00 p.m.[5]

---

[3] Anthony Purham, who worked at Gentlemen's Barbershop, testified that Polar made several visits to the barbershop during that period, and sometimes brought lunch for appellant.

[4] Jones also testified that at some point from January to April 2012, he saw Polar come to appellant's apartment to pick up something.

[5] Smith acknowledged that in September 2012, he suffered a conviction for commercial burglary.

## DISCUSSION

Appellant contends the trial court contravened section 654 in sentencing him. After identifying count 2 (the April 19, 2012 criminal threats) as the principal count, the trial court declined to stay the consecutive terms imposed on count 4 (the April 8, 2012 criminal threats) and count 1 (the stalking from April 8 to 25, 2012). Appellant argues that section 654 precluded the imposition of unstayed punishment on those counts. For the reasons discussed below, we disagree.[6]

### A. *Governing Principles*

Subdivision (a) of section 654 prohibits multiple punishment for "[a]n act or omission that is punishable in different ways by different provisions of law . . . ." Generally, when several counts are properly subject to section 654, a court must identify the count carrying the longest sentence, including enhancements, and stay the sentence imposed under the other pertinent counts. (*People v. Kramer* (2002) 29 Cal.4th 720, 722.) Thus, "[i]f . . . a defendant suffers two convictions, punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed." (*People v. Deloza* (1998) 18 Cal.4th 585, 592.) However, multiple punishment is proper if the defendant pursues suitably independent criminal objectives. (*People v. Williams* (1992) 9 Cal.App.4th 1465, 1473-1474.) "Whether the defendant held 'multiple criminal objectives is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any

---

[6]     As appellant asserts no challenge regarding the court's identification of count 2 as the principal count, we do not examine that aspect of appellant's sentence.

9

substantial evidence to support it.' [Citations.]" (*People v. Galvan* (1986) 187 Cal.App.3d 1205, 1218.)

Here, counts 1, 2, and 4 implicate a course of conduct. The test governing the application of section 654 in such circumstances was first stated in *Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part in *People v. Correa* (2012) 54 Cal.4th 331, 334: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." Under the *Neal* test, "if the offenses were independent of and not merely incidental to each other, the defendant may be punished separately even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citations.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. [Citation.]" (*People v. Green* (1996) 50 Cal.App.4th 1076, 1084-1085.)

B. *Criminal Threats (Count 4)*

We begin with the unstayed consecutive punishment for count 4 -- the April 8 criminal threats. After determining that count 2 -- the April 19 criminal threats -- constituted the principal count, the trial court declined to stay the consecutive term imposed on count 4, as the court determined that it "occurred on a separate occasion and with separate operative facts." We see no error in that determination.

As we elaborate below (see pt. C., *post*), the criminal threats charged in counts 2 and 4, together with appellant's other threats and misconduct from April

8 to April 25, constituted a course of conduct for purposes of the offense of stalking, as charged in count 1. However, under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 .) As explained in *People v. Gaio* (2000) 81 Cal.App.4th 919, 935 (*Gaio*), "[t]his is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. [Citation.]"

That principle is applicable to temporally separated criminal threats. In *People v. Felix* (2001) 92 Cal.App.4th 905, 909, the defendant made two death threats separated by a two-hour interval, the first of which was aimed at a group of people that included defendant's former girlfriend, and the second of which was directed solely at the former girlfriend. After the defendant was convicted on two counts of criminal threats based on the two incidents, the trial court imposed unstayed consecutive punishment for both crimes. (*Id*. at p. 915.) The appellate court rejected the defendant's contention that his sentence contravened section 654, reasoning that the defendant "had time to reflect before making the second threat." (*People v. Felix, supra,* at pp. 915-916; see also *People v. Trotter* (1992) 7 Cal.App.4th 363, 366-369 [unstayed consecutive terms properly imposed on three counts of assault predicated on defendant's successive gunshots at pursuing police, as defendant had time to reflect between each shot].)

We reach the same conclusion here. Although appellant's two charged acts of criminal threats were elements of a pattern of harassment directed at Polar, the threats were separated by a period of 11 days, during which appellant had ample time to reflect on whether he should issue another threat. The record thus

11

discloses sufficient evidence to support the trial court's imposition of unstayed consecutive punishment.

Appellant's reliance on *People v. Mendoza* (1997) 59 Cal.App.4th 1333 is misplaced. There, the defendant and his brother belonged to the Happy Town street gang. (*Id.* at p. 1337.) When the defendant's brother was charged with the murder of a police officer, the defendant told a witness who had testified at his brother's preliminary hearing that the witness had "'fucked up his brother's testimony'" and that "'[h]e was going to talk to some guys from Happy Town.'" (*Ibid.*) After the defendant was convicted of criminal threats and dissuading a witness, the trial court imposed unstayed punishment for each offense. (*Id.* at pp. 1345-1346.) The appellate court concluded that the sentence contravened section 654, as the record showed -- and the parties agreed -- that the two offenses "arose from a single act." (*People v. Mendoza, supra,* at p. 1346.) As explained above, that is not the case here. In sum, the imposition of unstayed consecutive punishment on count 4 -- the April 8 criminal threats -- did not contravene section 654.

C. *Stalking (Count 1)*

We turn to the unstayed consecutive punishment for count 1 -- the stalking from April 8 to 25. After identifying count 2 (the April 19 criminal threats) as the principal count, the trial court declined to stay the consecutive term for the stalking, concluding that the offenses reflected different intents, occurred on different occasions, and involved different operative facts. In view of the principles discussed above, the court did not err in so ruling.

Section 646.9 sets forth the elements of stalking. Subdivision (a) of that statute states, "Any person who willfully, maliciously, and repeatedly follows *or*

12

willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, . . . is guilty of the crime of stalking . . . . ” (Italics added.) The statute thus addresses “two distinct behaviors,” repeated following and harassment. (*People v. Heilman* (1994) 25 Cal.App.4th 391, 399.) The statute defines “harassment” as “engag[ing] in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose,” and defines “course of conduct” as “two or more acts occurring over a period of time, however short, evidencing a continuity of purpose. . . . ”’ (§ 646.9, subds. (e), (f).)

In closing arguments, the prosecutor advocated a theory of harassment-based stalking. He noted that two criminal threats had been charged as discrete crimes, but nonetheless maintained that all of appellant's misconduct from April 8 to April 25 constituted the course of conduct for stalking. The prosecutor argued: “Let's talk about stalking. [¶] That is, essentially, why we're here. You know, we could have honestly . . . alleged 40 or 50 different criminal threats. We picked two. We picked the April 8th call and picked the April 19th incident. We probably could have alleged a lot more. [¶] We are here for the stalking. That is *globally* what he is doing to her. He's stalking her.” (Italics added.) Later, after arguing that appellant had harassed Polar, the prosecutor asserted that the pertinent course of conduct encompassed the misconduct from April 8 to 25, including the “recorded messages,” together with “the vandalism and all of that.” He further stated that the evidence of the uncharged criminal threats was introduced to support the stalking count.

The record amply supports the prosecutor's theory that appellant's conduct in stalking Polar incorporated criminal threats other than those charged in counts 2

13

and 4. At trial, the prosecutor submitted unchallenged evidence of numerous phone messages from April 9 to 25, some of which contained threats. On April 13, appellant stated, "I'm going to fuck with your kids," and "I'm going to twist your ass up"; later, on April 18, he stated that unless Polar bought him a ticket to a play that he believed she owed him, he was "going to have [his] home girl beat [Polar's] fucking ass."[7] In addition, on April 25, she became "very alarmed" when she found a note from him stating, "Watch yourself in those apartments is the only advice I have."

Under the circumstances present here, the trial court properly imposed unstayed punishment on count 1, as appellant's conduct in stalking Polar incorporated misconduct not charged in counts 2 and 4, including instances of criminal threats. Appellant's harassment of Polar involved separate acts over a lengthy span of time, which provided him ample time to reconsider his conduct. Each separate act reflected a particular intent to "alarm[], annoy[], torment[], or terrorize[]" Polar, or placed her in fear for her safety (§ 646.9, subds. (a), (e)). That is especially true of the uncharged criminal threats noted above, which were temporally separated from the criminal threats charged in counts 2 and 4. Because appellant, in making the uncharged threats, had an "opportunity to reflect and to renew his . . . intent" (*Gaio*, *supra*, 81 Cal.App.4th at p. 935), the record supported the trial court's determination that his course of conduct in stalking Polar reflected "renew[ed]" intents for which unstayed additional punishment was properly imposed.

---

[7] In closing argument, the prosecutor played for the jury clips of telephone calls other than those constituting the threats alleged in counts 2 and 4, noting that "they go to the stalking count."

D.  *Failure to Impose Mandatory Fees*

Respondent contends the trial court failed to impose certain mandatory fees in sentencing appellant.  Section 1465.8, subdivision (a), provides that a $40 court operations assessment "shall be imposed" on every conviction for a criminal offense.  Similarly, Government Code section 70373 provides that a $30 court construction fee "shall be imposed" on every conviction for a criminal offense.  At the sentencing hearing, the trial court orally imposed only a single $40 court operations assessment and a single $30 "criminal conviction fee," but the abstract of judgment reflects the imposition of court operations assessments totaling $200 and court construction fees totaling $150.  As the court was required to impose the fees upon sentencing appellant, the judgment must be modified to include a $40 court operations assessment and a $30 court construction fee for each of appellant's five convictions.  (*People v. Schoeb* (2005) 132 Cal.App.4th 861, 866; *People v. Lopez* (2010) 188 Cal.App.4th 474, 480.)

## DISPOSITION

The judgment is modified to reflect the imposition of a $40 court operations assessment and a $30 court construction fee on each of appellant's convictions (counts 1 through 5). In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.