Filed 5/24/22  P. v. Perez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>EDDIE PEREZ,<br><br>     Defendant and Appellant. | F079814<br><br>(Kings Super. Ct. No. 15CM4540)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tartar, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kari Ricci Mueller and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant and defendant Eddie Perez was convicted of multiple crimes arising out of attacks and rapes of his 16-year-old girlfriend.  Among these crimes were rape, torture, and spousal abuse.  The trial court executed three consecutive sentences of life without the possibility of parole on three separate rape counts that included "One Strike" law

special circumstances for the infliction of torture and commission of rape against a child 14 years of age or older. The trial court also imposed a consecutive sentence of 10 years on a spousal abuse count. On appeal, defendant contends the trial court erred in sentencing him for the substantive offense of spousal abuse and one-strike torture special circumstance because the two offenses were part of the same course of conduct. We affirm.

## PROCEDURAL SUMMARY

A Kings County grand jury returned an indictment on September 18, 2015, charging defendant with rape (Pen. Code, § 261, subd. (a)(2);[1] counts 1 through 4), forcible oral copulation (former § 288a, subd. (c)(2), current § 287, subd. (c)(2)(A); count 5), sexual penetration upon a minor 14 years of age or older (§ 289, subd. (a)(1)(C); count 6), torture (§ 206; count 7), assault with intent to commit rape (§ 220, subd. (a); count 8), criminal threats (§ 422; count 9), mayhem (§ 203; count 10), kidnapping (§ 207, subd. (a); count 11), two counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 12 & 13), and two counts of domestic violence (§ 273.5, subd. (a); counts 15 & 16).

As to counts 1 through 6, the indictment also alleged multiple one-strike circumstances that the offenses occurred with a child 14 years of age or older and involved kidnapping, torture, tying or binding, use of a deadly weapon, and inflicting of great bodily injury (§ 667.61, subds. (a), (c), (d)(2), (d)(3), (d)(6), (e)(1), (e)(3), & (e)(5)). An enhancement for infliction of great bodily injury (§ 12022.7, subd. (a)) was alleged as to counts 1 through 7 and 13, and an enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)) was also alleged as to counts 1 through 7, 9, 10, 11, and 16. Defendant pled not guilty and denied all special allegations.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

On June 17, 2019, a jury trial began, and counts 9, 12, and 15 were dismissed by motion of the People prior to jury deliberations. A first amended indictment was filed to reflect the remaining allegations.

On June 27, 2019, the jury found defendant guilty of three counts of rape (counts 1, 2 & 4), torture (count 7), assault with intent to commit rape (count 8), mayhem (count 10), assault with a deadly weapon resulting in great bodily injury (count 13), and spousal abuse resulting in great bodily injury (count 16). The jury also found true enhancement allegations for the personal use of a deadly weapon as to counts 7, 10, and 16. Pursuant to section 667.61, subdivisions (d)(3) and (n)(1), the jury also found true the special one-strike circumstances that the rape was committed against a child 14 years of age or older and involved torture.

The jury found not true the one-strike special circumstances that defendant personally inflicted great bodily injury and used a dangerous weapon in commission of counts 1, 2, & 4. The trial court declared mistrials as to counts 3, 5, 6, 11 and 14, and it dismissed the one-strike special circumstances of kidnapping after the jury became deadlocked on those allegations.

On August 8, 2019, the trial court sentenced defendant to three consecutive indeterminate terms of life without the possibility of parole on counts 1, 2, and 4 under the One Strike law and a determinate term of 10 years for count 16 with consecutive terms of a four-year upper term, five years for great bodily injury enhancement, and one year for the deadly weapon enhancement. The trial court stayed execution of sentences on counts 7, 8, 10, and 13 pursuant to section 654. Defendant filed a timely notice of appeal on August 16, 2019.

## FACTUAL SUMMARY

Confidential victim (C.V.) and defendant began dating in late 2014 after meeting each other on a social media website. At the time, C.V. was 16 years old, and defendant was 19 years old. C.V. and defendant became sexually active "right away." Defendant

3.

first became violent with C.V. prior to January 2015. The prior incident occurred when C.V. snuck out of her mother's home to see defendant.

On that night, mother and defendant had a brief encounter with one of defendant's friends. Defendant then began questioning C.V. if she had been with his friends earlier in the day because the friend appeared around the same time as her. Defendant pushed C.V. against a fence, and he began hitting both of her arms with closed fists. Afterwards, defendant brought her to his house and applied vinegar and ice in an attempt to get rid of the bruises forming on her arms. C.V. stayed with defendant instead of returning to school the next few days because she did not want anyone to notice the bruises on her arms. Upon her return to school, two of C.V.'s friends noticed the bruises, and she told them how she sustained them.

On the night of January 16, 2015, defendant picked C.V. up from her home, and they spent the night in the car after driving around Coalinga. The following day, defendant and C.V. stopped at defendant's home in Avenal before staying the night in the car in Pismo. They spent the day together in Pismo, and defendant went to Hanford to give a ride to some of his friends. Defendant began asking C.V. if she cheated on him over Christmas and New Years after he dropped off his friends. Despite C.V.'s repeated denials of cheating, defendant became upset and drove her to a field.

Once defendant parked in the field, he told C.V. that he would not do anything if she told him the truth, but he was going to hurt her if she lied. Defendant eventually began punching her in the leg with a closed fist. C.V. tried to fight back, but defendant pushed her head down and started hitting her in the head. Then defendant grabbed a car charger and used it to hit C.V. in the face, which caused her lip to swell and bleed.

C.V. continued to deny his repeated questions about cheating until she claimed that she had cheated to appease defendant. However, defendant continued to hit C.V. in the arms, and he stepped out to the trunk of his car to retrieve a cross-shaped tire iron made of metal. Defendant used his full force to strike C.V. in her left arm and leg and

4.

back with the tire iron. C.V. pleaded for defendant to stop, but he continued to hit her repeatedly. Defendant also used the flat part of a knife blade that he grabbed from his glove compartment to hit her in the face. The knife blade hit her in the corner of her eye after a few times, and it caused her to bleed.

Defendant and C.V. were parked in the field for a few hours, and defendant was hitting her during the entire time. C.V. did open the car door in an attempt to run from defendant at one point. C.V. was not able to get far because defendant pushed her down, grabbed her by the hair, and dragged her back into the car. Defendant told her that he did not want her to run away or leave him. C.V.'s left leg and arm were in pain and starting to swell, and she had difficulty standing on one leg. Defendant also threw C.V. out of the car and onto the ground, and he put her face into the dirt for 20 to 30 seconds to prevent her from breathing. After the assault in the field, C.V.'s arms and fingers were swollen, her leg was in pain, and she had difficulty moving her leg.

Defendant drove her to an apartment complex and C.V. jumped out of the car. C.V. banged on an apartment door, but she passed out by the time she heard a woman asking who was at the door. Defendant carried C.V. on his shoulder and put her back in the car. He told C.V. that she "messed up" for trying to run off and ask for help. Defendant claimed he was going to take her back to the field, but he stopped on the side of the highway. Defendant threatened to leave C.V. on the side of the road, and C.V. complied with his demand for her to remove her pants.

Next, defendant drove them to an apartment parking lot, and he began to press the tire iron into her arm where it was already swollen. Defendant pushed the tire iron into her arm a few times, and C.V. felt a lot of pain in response to the poking of her swollen arm. Defendant then told C.V. that he was "horny" and moved her seat and leg before getting on top of her. C.V. told defendant that she did not want to have sex, but he threatened to hit her again if she did not have sex with him. Defendant took off C.V.'s underwear, put his penis inside her vagina, and ejaculated inside of her.

5.

During the time of the first sexual assault, C.V.'s leg, arm, and face were swollen, red, and bleeding. C.V. could not recall the exact timeframe, but defendant had intercourse with her two more times by moving her injured leg each time. Each time C.V. told him she did not want to, and she was unable to move her injured leg.

After the assault in the field and rape in the parking lot, defendant drove C.V. to a friend's apartment in Hanford. C.V. told defendant that she needed a shower, and he carried her because she passed out when she tried to stand up to get out of the car. Defendant's friends asked C.V. about her injuries because she was throwing up, walking with a limp, and complaining about pain in her arm. C.V. agreed with defendant's lie that she fell off a quad because she believed defendant's friends would cover up for him.

C.V. spent a day at the apartment, and defendant helped her take a shower and eat. C.V. told one of defendant's friends that she was waiting for defendant to take her to the hospital. Defendant put vinegar on her injuries in an attempt to treat them, but the vinegar burned when it was applied. C.V. recalled being in the car for a few more days after leaving his friend's apartment, and he did not hit her during that period of time. Defendant did tie her hands to prevent her from using her hands to put pressure on her face and arms to ease the pain. He also tied her hair to the car headrest to prevent her from moving her head and signal for help. C.V. made attempts to yell for help at a gas station, however, no help came for her. On other occasions C.V. made no attempt to escape or call for help when she had an opportunity to reach out for help.

While in the car, C.V. was forced to urinate on herself because she had no strength to get out of the car. Defendant fed her Cup of Noodles, and she drank a sports drink, but she kept throwing up everything she ate or drank. By the last day, C.V.'s right hand, fingers were swollen and painful, and she also had pain in her back, arms, and head. Her left leg was red and purple in color, covered in circle-shaped markings, and had pus coming out of it. She believed her wounds were infected because of their smell. C.V.'s left arm had even more markings than her leg, and she was unable to lift the arm or move

6.

her fingers. C.V. wanted to pass out, but she was afraid that she would never wake up if she did.

C.V. was finally able to get the attention of another person to provide her with help after defendant tried to ask someone for gas money at an apartment complex. C.V. opened the car door and called to a resident of the apartments, Charles Price. Price noticed C.V.'s injuries and she asked him to call the police because her boyfriend had beat her. Price called 911, and officers from the Hanford Police Department responded to the scene.

Corporal Jason Gustin was unable to see into the back seat of the car as he approached defendant's car. Gustin smelled an overwhelming odor of urine as he opened the car door. Body cam footage was captured of Gustin's initial contact with C.V., and the footage was played for the jury. C.V. was transported to the emergency department of Community Regional Medical Center in Fresno. Detective Ryan Tomey made contact with C.V. at the hospital, and he found her to be riddled with cuts, bruising, and an infection on a good portion of her body.

An emergency room physician observed numerous bruises of varying ages on her body, burns, signs of infection on her leg, and two fractures on her right hand. C.V.'s left arm was documented as being swollen with burn like injuries. C.V. also had puncture wounds to her legs, a road rash abrasion on her bottom, hickey on her neck, and abrasions and bruising to her face and forehead. A forensic sexual assault examination was also performed, which found defendant's sperm on swabs taken from C.V.'s vagina. Twelve different injuries were documented by hospital staff all together.

The infection on C.V.'s leg was considered "life-threatening" with pus going from the knee to the ankle and up in the thigh. This necrotizing infection creates a foul odor of decomposing flesh. Hospital staff performed surgery to make C.V.'s infected wound larger to access the infection for irrigation. C.V.'s right hand had one fracture in the fifth

digit of her finger and one in the second metacarpal. The metacarpal was exposed to the air, which required irrigation to remove any foreign material that could cause infection.

C.V.'s left hand and arm also underwent surgery that would leave permanent scarring and potential stiffness in the joint. A temporary pin was inserted into her pointer finger for six to eight weeks to allow the bone to heal. The third-degree chemical burns on her left arm required skin grafting while other areas of her skin were dead. C.V. would have chronic open wounds that were at risk of life-threatening infection without the skin grafting. In total, C.V. spent 32 days in the hospital, underwent multiple surgeries, and was left with permanent scars on her arms, legs and face.

Defendant was arrested on January 31, 2015, at an apartment in Hanford. As the arresting officer placed handcuffs on him, he made a spontaneous statement that he "had evidence." As he was transported to the police station, defendant stated there was a misunderstanding, he did not rape C.V., he believed C.V. was over 18 years old, he claimed her injuries were caused by falling from a quad, and she did not want to go to a hospital.

At the police station defendant stated that he and C.V. dated for three months, but he denied that they were sexually active. Defendant drove them around between Hanford and the coast for about a week, and they slept in the car. He last saw C.V. on January 30, 2015, and he believed she had been taken by "some Mexicans." Defendant claimed he made efforts to contact law enforcement, however, he was unable to borrow a phone.

Law enforcement seized defendant's car, and a subsequent search discovered blood spatter matching C.V.'s DNA on the interior of the passenger door. The fabric liner on the ceiling of the car had cuts and holes above the driver's seat. A blanket found in the car had a strong odor of urine, and a tire iron was located in the trunk. The defense offered no witnesses or additional evidence after the prosecution's case-in-chief.

## DISCUSSION

Defendant contends that the trial court was required to stay his sentence for domestic violence with a great bodily injury enhancement (§ 273.5) on count 16 because he was also sentenced for the one-strike torture circumstance on the three rape counts (counts 1, 2 & 4). Defendant argues that the three rapes and domestic violence offenses were part of the same course of conduct with a singular objective of maintaining continuous physical control over C.V.

### A.    *Legal Principles*

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

The inquiry to determine whether separate sentences can be imposed pursuant to section 654 is "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19). That inquiry turns on "the intent and objective" of the defendant. (*People v. Correa* (2012) 54 Cal.4th 331, 335–336.) " 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid.*) However, "multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm. [Citations.] 'Separate sentencing is permitted for offenses that are divisible in time ….' " (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry …. We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act – i.e.,

9.

a course of conduct – do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312.)

"At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*People v. Corpening*, *supra*, 2 Cal.5th at p. 312.) If step two is reached, the trial court makes a factual determination whether the defendant harbored a separate intent and objective for each offense. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

Appellate courts have cautioned against viewing a defendant's intent and objective so broadly. (*People v. Perez* (1979) 23 Cal.3d 545, 552–553.) "To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to [ensure] that a defendant's punishment will be commensurate with his culpability." (*Id.* at p. 552.) "It would reward the defendant who has the greater criminal ambition with a lesser punishment." (*Ibid.*) "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*Id.* at p. 553.)

"[I]f a series of acts are committed within a period of time during which reflection was possible [citation], section 654 does not apply." (*People v. Kelly* (2016) 245 Cal.App.4th 1119, 1136.) "Under section 654, 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public

10.

security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

**B.     *Standard of Review***

The trial court's implied findings that crimes were divisible are upheld if supported by substantial evidence. (*Ibid*.) " ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.)

**C.     *Analysis***

Defendant's primary argument is that the conduct underlying his infliction of torture on C.V. in the commission of three separate rapes (counts 1, 2 & 4) and infliction of corporal injury causing great bodily injury on C.V. (count 16) were pursuant to the same objective of maintaining physical control over C.V. As noted above, "[s]ection 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) The purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.)

Section 654 has only relatively recently been applied to limit enhancements, specifically conduct enhancements, or those arising from the circumstances of the substantive offense as opposed to the status of the offender. (*People v. Ahmed* (2011) 53 Cal.4th 156, 160–161, 163 (*Ahmed*) [Enhancements are " 'provisions of law' " under which an " 'act or omission' " is " 'punishable.' "].) The section 667.61 circumstance of torture during the commission of a rape is not an enhancement; it is part of the One Strike sentencing scheme or alternative penalty provisions. Nonetheless, the circumstance could be characterized as functionally equivalent to a conduct enhancement for purposes of section 654 analysis, in that it focuses on the manner in which the underlying offense was committed. (See *People v. Kelly*, *supra*, 245 Cal.App.4th at p. 1131.)

11.

*People v. Wooten* (2013) 214 Cal.App.4th 121 (*Wooten*), explains that, under *Ahmed*, "[a] sentence enhancement relates to an aspect of the substantive offense to which it attaches, not to other similar enhancements for separate criminal acts." (*Wooten*, at p. 130.) *Wooten* holds, in turn, that to the extent section 654 does not bar separate punishment for multiple criminal acts which are divisible because they reflect separate intents, objectives, or events, it similarly does not apply to an enhancement properly attached to those offenses. (*Ibid.*) Accordingly, "the same type of enhancement may be imposed for each substantive offense committed with differing intent or for a different purpose." (*Id.* at p. 131, italics added.) In other words, "[s]o long as the conduct giving rise to the convictions of separate substantive offenses is divisible or arises from separate criminal acts, neither section 654 nor *Ahmed* requires the staying of the attached enhancements." (*Ibid.*)

Here, there is substantial evidence to support the trial court's implied conclusion that defendant harbored multiple, independent, simultaneous objectives in torturing C.V. during the commission of three separate rapes and a violent assault of C.V. The conduct alleged to comprise the one-strike torture circumstance and infliction of corporal injury (count 16) was not specified in the information, jury instructions, or the verdict form. However, the torture and corporal injury counts both mention the use of a tire iron. The jury did not find the great bodily injury enhancement as to the three rape counts, but it did find the great bodily injury enhancement true as to the corporal injury count.

The trial court sentenced defendant to three terms of life in prison without parole on the rape convictions and 10 years on the corporal injury conviction. The trial court stayed the sentences on counts 7 (torture), 8 (assault with intent to commit rape), 10 (mayhem), and 13 (assault with a deadly weapon) pursuant to section 654. Based on the way the trial court applied section 654, the trial court's implied findings are that defendant had an intent and objective separate from torture when he engaged in the acts giving rise to the corporal injury conviction. In challenging these findings, defendant

12.

points to statements in the prosecutor's closing arguments that defendant inflicted mayhem and torture "throughout these five days" and used a tire iron in committing torture and corporal injury.

We will first note that the trial court was not bound at sentencing by the prosecutor's argument. (*People v. Green* (1988) 200 Cal.App.3d 538, 543–544; 545, fn. 5 [determination of separate objectives for purposes of section 654 is a question of fact for the trial court at sentencing, notwithstanding the position taken by the prosecution].) Furthermore, the use of a course of conduct theory to prove torture does not require a finding of single intent and objective for purposes of section 654. Therefore, defendant's contention that the abuse of C.V. "began when she was hit by [defendant] and continued through the entire time [C.V.] was with [defendant] until she was able to get help from Price" does not help his position. "[I]t is well established that a defendant may harbor 'separate and simultaneous intents' in committing two or more crimes, for purposes of section 654." (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1007.)

The question to be resolved then is not whether the torture was committed through a course of conduct that comprises acts of domestic violence, or what facts the prosecution argued in relation to certain charges. The actual determination that must be made is whether there is sufficient evidence in the record to support the trial court's findings that the acts giving rise to the domestic violence conviction for which defendant was punished were committed with a separate objective from the one-strike torture circumstance.

Defendant cites *People v. Mejia* (2017) 9 Cal.App.5th 1036 (*Mejia*) in support of his argument that the trial court committed error under section 654, but that case does not assist him. In *Mejia*, the defendant engaged in a horrific course of conduct that included tying up his wife, raping her, using a Taser on her, threatening to kill her, and locking her in a closet, among other detestable acts. He was convicted of torture; spousal rape with

13.

tying and binding; infliction of corporal injury on a spouse; and criminal threats. (*Id.* at p. 1039.)

*Mejia* held that section 654 precluded punishment for both torture and the underlying rape and infliction of corporal injury. The *Mejia* court rejected the Attorney General's argument that the defendant had separate objectives in torturing and raping the victim. (*Mejia*, *supra*, 9 Cal.App.5th at p. 1045.) *Mejia* held that the defendant's objectives were irrelevant because each act of spousal abuse made up the intentional acts underlying the torture conviction. (*Ibid.*) Specifically, *Mejia* held that section 654 applies "because all of the acts of spousal rape and of infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense." (*Mejia,* at p. 1046.)

*Mejia* is inapposite because here the acts of infliction of corporal injury were not essential to establish the torture circumstance. The elements of defendant's infliction of corporal injury causing great bodily injury were satisfied by defendant's initial assault of C.V. with his fists and the tire iron before C.V. attempted to escape the vehicle. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477 [Infliction of corporal injury resulting in a traumatic condition on a cohabitant (§ 273.5, subd. (a)) is completed after a single instance of "willful and direct application of physical force upon the victim resulting in a wound or injury"].)

All physical acts completed after C.V.'s initial escape attempt, including the continued assault of C.V. with the tire iron, pressing on her wounds with the tire iron, multiple rapes, and infliction of chemical burns, were sufficient on their own to establish the elements of the torture circumstance. Furthermore, *Mejia* did not address the Supreme Court's holding that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment where the defendant is afforded the opportunity to reflect and renew her intent. (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) As we will discuss in more detail below, the physical acts

comprising the corporal injury offense were also divisible in time and not necessary to, nor facilitative of the torture circumstance, which comprised physical acts subsequent to C.V.'s attempt to escape.

*People v. Assad* (2010) 189 Cal.App.4th 187, is instructive. In that case, the defendant argued that he could not be separately punished for corporal injuries occurring within the same period as his conviction for torture on a course of conduct theory. (*Id.* at pp. 200–201.) However, given the evidence presented at trial, the defendant failed to show that the corporal injury counts were part of the course of conduct upon which the torture conviction was based. (*Id.* at p. 201.) Further, the defendant's section 654 arguments concerning his sentences for mayhem and torture failed because the evidence presented established multiple acts satisfying the legal requirements for both counts. (*Assad*, at p. 200.)

Accordingly, the question in our case is whether defendant's course of conduct was divisible or indivisible. (See *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267.) This determination "depends on the 'intent and objective' of the actor." (*Ibid.*) "If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*Id.* at pp. 267–268.)

Defendant's injuring conduct comprised several distinct physical acts, including the repetitive and violent beatings of C.V. with various objects while parked in the field, applying pressure to C.V.'s swollen arm with the tire iron in the apartment parking lot, raping her while she was in pain and unable to move her leg, and inflicting chemical burns on the wounds defendant recently inflicted. Defendant initially assaulted C.V. by repeatedly punching her with a closed fist after she denied that she was cheating on him.

15.

The defendant's initial objective was made rather clear after he told C.V. that he would hurt her if she lied to him.

After C.V. attempted to fight back, defendant escalated the violence by punching her in the head and hitting her in the face with a car charger that caused her lip to swell and bleed. The violence escalated further once defendant tried to stop defendant by stating that she had cheated on him. C.V. testified that this only made things worse because he proceeded to retrieve a tire iron from the trunk of the car to strike her on her left arm and leg with all of his strength. Defendant also hit her in the eye with a knife blade.

C.V. attempted to escape during the assault by opening the car door and running, but defendant caught her and told her that he did not want her to leave. The assault with the tire iron in the car lasted for a couple of hours, and the trial court could reasonably conclude that defendant began the attack with the objective to punish C.V. for his belief that she was lying to him and eventually that she cheated on him. However, another criminal objective arose once C.V. attempted to run away from him during the field incident. That is, he began punishing C.V. to prevent her from running away from him.

Defendant's separate and distinct objective was made clear when C.V. attempted to run from the car at the apartment complex. Defendant's response was that she "messed up" for trying to run off, and he demanded her to take off her pants if she did not want to get hurt. His statement that C.V. "messed up" and threat to hurt her if she failed to take off her pants highlighted defendant's new and separate objective of maintaining control to prevent C.V. from leaving. Defendant furthered this objective to punish and prevent C.V. from running away when he started to poke her swollen arm with the tire iron in the moments before he told her he was "horny" and began raping her. After raping her, defendant put vinegar on her injuries, which resulted in third degree chemical burns.

16.

Unlike the defendant in *Mejia*, who was punished twice for violent act comprising spousal rape, corporal injury, and torture with the objective of causing cruel pain and suffering, defendant was punished for at least multiple violent acts with at least three separate objectives: (1) the initial assault in the field with fists and tire iron, during which he repeatedly struck C.V. to punish her for lying and cheating; (2) the continued assault with the tire iron for the purpose of punishing her for running away from him; and (3) the forcible sexual assault in the parking lot, to gratify his sexual desire and continue punishing C.V. for trying to run away a second time.

It makes no difference that defendant may have relied on a single instrument, such as the tire iron, to carry out two of his objectives. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 [the temporal proximity of the events does not mean they were part of one indivisible course of conduct].) The different physical acts accomplished with the tire iron do help highlight defendant's multiple objectives. Defendant's violent and uncontrolled beating of defendant with his fists and tire iron made clear his intent to punish C.V. for lying and cheating on him.

The sadistic purposes of defendant's infliction of torture comprise his revenge for C.V.'s attempt to run away and persuasion to keep her from running again. This objective was accomplished through the additional beating of C.V. with a tire iron after her escape, applying forceful and controlled pressure on C.V.'s swollen arms after her second attempt to escape and before raping C.V., and infliction of chemical burns that resulted in permanent disfigurement after raping C.V. Substantial evidence supports the trial court's implicit finding that defendant's actions during the assault and subsequent rapes were in pursuit of more than one objective. Therefore, the trial court did not err when it did not apply section 654 to the corporal injury conviction.

We also find that the trial court could have reasonably determined that the violent striking of C.V. with his fists and tire iron before C.V. attempted to run from the car was a separate act, divisible in time and space, which was also not necessary to, nor

facilitative of, the commission of torture during the continued assault and rape of C.V. after she attempted to run from the car. Defendant had the opportunity to reflect before he chased down C.V. during her attempt to escape, however, he continued to assault her and proceeded to rape her. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [If each act is volitional and calculated, separated by periods of time during which reflection is possible, section 654 does not prohibit punishment of each act because each act evinces a separate intent to do violence].)

Because the acts resulting in C.V.'s injuries occurred over the course of several hours, defendant had the "opportunity to reflect and to renew his … intent before committing [each] one." (*People v. Gaio*, *supra*, 81 Cal.App.4th at p. 935.) Section 654 does not preclude multiple punishment in these circumstances. (See *People v. Nubla* (1999) 74 Cal.App.4th 719, 730–731 [section 654 did not preclude punishment for both assault with a deadly weapon and corporal punishment of a spouse where one offense neither facilitated, nor was incidental to, the other].) Accordingly, we find no error under section 654.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, ACTING P. J.

WE CONCUR:


DETJEN, J.


SNAUFFER, J.


18.