Filed 1/21/26  P. v. Zaczkiewicz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. SUAVEA ANTHONY ZACZKIEWICZ, Defendant and Appellant. | D084817 (Super. Ct. No. SCN442815) |

APPEAL from a judgment of the Superior Court of San Diego County, Laura E. Duffy, Judge.  Affirmed as modified.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

After a night of socializing, Alana G. spurned the romantic advances of Suavea Anthony Zaczkiewicz, a community college classmate who suffers from delusional disorder, posttraumatic stress disorder (PTSD), and substance abuse issues. Over the next month, Zaczkiewicz sent hundreds of troubling text messages, e-mails, and social media communications to Alana, including messages threatening to slit her throat, make her bleed out, throw her body in a ditch, kill her four-year-old son, and kill himself. He also accosted Alana in public. Based on this conduct, a jury found Zaczkiewicz guilty of one count of felony stalking and two counts of making criminal threats.

On appeal from the judgment of conviction, Zaczkiewicz presents two claims of error. First, he contends the trial court erred by denying his motion for pretrial mental-health diversion because substantial evidence does not support the court's factual finding that he posed an unreasonable risk of danger to public safety. Second, he argues Penal Code section 654 required the trial court to stay the punishment for two of his three convictions because they all arose from the same physical act or, alternatively, he acted pursuant to a single criminal objective.[1]

We reject Zaczkiewicz's argument concerning the sufficiency of the evidence supporting the trial court's pretrial diversion ruling. We also reject his claim that section 654 required the court to stay the punishment for two of his three convictions. However, we conclude that section 654 required the court to stay the punishment for one of his two criminal threat convictions

---

[1] Further undesignated statutory references are to the Penal Code.

(counts 2 and 3). Therefore, we modify the judgment to stay the punishment for count 3. As modified, the judgment is affirmed.

## II

## BACKGROUND

A second amended information charged Zaczkiewicz with one count of stalking (§ 646.9, subd. (a); count 1) and two counts of making a criminal threat against Alana (§ 422; counts 2 & 3). It alleged he suffered three prior strike convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12), and two serious felony priors (§ 667, subd. (a)). It also alleged two aggravating circumstances: (1) his prior criminal convictions were numerous and of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)); and (2) he served a prior prison term (*id.*, rule 4.421(b)(3)).

As we will discuss, the defense filed a motion for pretrial diversion to postpone the criminal proceedings and allow Zaczkiewicz to undergo mental health treatment. After a hearing, the trial court found Zaczkiewicz was not suitable for pretrial diversion because he posed an unreasonable risk of danger to public safety. Therefore, the court denied the pretrial diversion request and the case proceeded to trial.

A. *Prosecution Case*

Alana met Zaczkiewicz in August 2022, while they were both students at the same community college. They had classes together in the fall 2022 semester and another class together in the spring 2023 semester. Their relationship was cordial and platonic. They occasionally socialized and studied together with other students. She also gave him rides to a bus stop on the way to pick up her four-year-old son from preschool.

3

On February 27, 2023, Zaczkiewicz sent a text message to Alana while she was at a shopping center with her friend, Sarah.[2] Zaczkiewicz offered to give a tablet device to Alana's son. Alana felt uncomfortable accepting the gift, but she and Sarah agreed to meet Zaczkiewicz for a drink at a food hall in the shopping center. The group met that afternoon, had drinks, and spent a few hours at the food hall.

At about 5:00 p.m., after Sarah left, Zaczkiewicz and Alana continued hanging out. Zaczkiewicz accompanied Alana as she picked up her son from preschool, stopped at a gas station for beer, and drove to her mother's home. There, Alana made dinner for Zaczkiewicz, her son, her mother, and herself. Alana put her son to bed and the three adults watched television.

At about 10:00 p.m., Alana asked Zaczkiewicz to leave because it was getting late. He told her he was ordering an Uber, but he apparently never requested one. A half hour later, she again asked him to leave, and he again said he was ordering an Uber. While they were ostensibly waiting for the Uber, Alana received a phone call from her boyfriend and took the call from the bathroom. Zaczkiewicz banged on the bathroom door and became upset, frustrated, and argumentative. At another point in the evening, Zaczkiewicz kissed Alana on the lips. She described the encounter as "weird and awkward," and she backed away when he kissed her. As the night wore on, Alana and her mother asked Zaczkiewicz to leave the house dozens of times, and he finally left shortly after midnight.

When Alana awoke the next morning, she had received dozens of angry and troubling text messages from Zaczkiewicz. In one message, he said, "don't ever in your life talk to another dude you fucking with around me." In

---

[2]     Unless otherwise noted, all dates referenced in this opinion shall be to dates from the year 2023.

4

another message, he said, "I'm just mad, Alana. That's it. Like, I fucking hate my life." In another message, he asked her to allow him to sleep in her car because he was homeless. He also called her vulgar names and claimed she had disrespected him. Alana replied to Zaczkiewicz and told him she was not romantically interested in him, he had made her mother uncomfortable, and she did not want to be in "this situation" with him.

Alana reported Zaczkiewicz's text messages to the police and the community college she and Zaczkiewicz attended. The community college initially instituted a no-contact order, which prohibited Zaczkiewicz and Alana from communicating with each other, and later expelled Zaczkiewicz. Alana also blocked text messages and calls from Zaczkiewicz's phone number. However, he circumvented these efforts by sending her text messages from different phone numbers, e-mailing her, and messaging her on social media platforms.

In one e-mail to Alana, Zaczkiewicz wrote, "Ay, real talk. If I'm incarcerated, being I don't care if you believe it or not but God sent me to you. So I'm not giving up." In another e-mail, he wrote, "And if you're gonna be weird on shit and try to avoid me, I'll help you out by making it weirder. LOL. Don't trip. You'll see what's up."

On March 10, Zaczkiewicz sent Alana a message that said, "You are the devil and I pray to God that God takes you off this planet. The last person that tried to fuck with my life got hit by a semi-truck. I don't need to hurt you. The universe will get rid of your gray-haired ugly ass soon. Never wished death upon anyone, but I hope you die. Please go do coke and overdose, dope fiend slut." That same day, Zaczkiewicz also sent Alana a website link to an obituary of someone she did not know.

The following day, on March 11, Zaczkiewicz sent Alana a message that read, "If I were you, I'd hide because his friends [presumably, the friends of the deceased person referenced in the obituary] are going to kill you."

On March 14, Zaczkiewicz sent Alana a message that stated, "Ay, bitch. Check it out. On my muthafuckin life you will get dealt with accordingly. I don't give a fuck about rules or the law. So fuck that school and fuck the police. You ruin my life. So get ready for the consequences. We could have talked this out through Ashley, but you had to go to extremes. Bet ... you think you're crazy? I'm a fuckin sociopath. I'll see you at school tomorrow."[3]

On March 14, Zaczkiewicz sent Alana another message that read, "I'll blow my head off in front of [your son's] preschool. How about that? I think that suffices. I was going to do it in the student equity center but those people don't deserve that trauma. You and Alana do. I'm gonna kill myself in your presence. Go ahead. Press charges. Proof beyond a reasonable doubt is the reason why the police can't do shit about anything I'm doing."

On March 15, Zaczkiewicz called Alana 12 times and sent her 14 text messages. One of the messages read, "FYI I don't stalk. If I did, I'd go to your house and watch your every move. IDGAF who you are. No one ignores me. The day before I beat this dude's ass for calling me a monkey, I blew his fucking up. Anyone who ignores me or pisses me off will experience this. I definitely don't discriminate. The fuck I look like stalking you for?"

On March 17, Alana received two sets of text messages from Zaczkiewicz, which formed the basis for counts 2 and 3. The first set of text messages stated, "You['re] gonna get your throat sl[i]t and thrown in a ditch if you ever step foot on that campus again[]. [¶] You will get murderer. [¶]

---

3    According to Alana, Ashley was an employee who worked for the community college program in which Alana and Zaczkiewicz were enrolled.

6

Dead fucking serious." The second set of text messages read, "I can't wait until I look into your eyes while you bleed out to death. [¶] This is all your fucking fault and I'll make your suffer. I'll even kill your son if I have to[]. [¶] This is Mike [by the way]. [¶] You['re] gonna die next week and that's for a fact."[4]

After reading these messages, Alana left San Diego for a week out of fear for her safety. She also dropped out of her community college program and removed her son from preschool.

On March 22, Zaczkiewicz sent Alana a text message that stated, "I might kill someone or myself. I do everything with pure intentions and get handed a pile of shit in return. This would've never happened if I didn't think about you and your son when I got that tablet. [The community college] was my escape from pain and having a good heart stole it all away from me. I promise on my sister's life I'm going to shoot any cop that tries to talk to me about you. This shit ain't over. Stupid ass bitch. So go ahead and get an innocent person killed because you wanna be a dumb bitch."

On March 28, after Alana returned to San Diego, she and Sarah went to Pacific Beach together. While they were walking down the boardwalk, Zaczkiewicz and two other people walked by them in the opposite direction. Zaczkiewicz approached the women and repeatedly asked Alana if they were "good." Sarah replied, "You know, we're not good."

The parties went their separate ways and, an hour later, Zaczkiewicz sent several text messages to Alana. One message read, "I feel like you've been following me. You a weird ass bitch in God. I won't press the issue but remember you're nothing but trash. Dumb bitch. I got eyes on you too. Get

---

4    Alana testified she did not know who Zaczkiewicz was referencing when he identified himself as "Mike."

7

the fuck out of [Pacific Beach].  Dirty bitch."  Another message stated, "Tell your ho ass friend to mind her fucking business.  She's lucky as fuck I didn't spazz out on her stupid ass."  Another message read, "The two dudes I was with both had automatic Glock and the other a regular pistol.  If you got an old white dude following, please let him know he'll get killed if he keeps following me.  This isn't a threat to you.  It's for whoever is tracking me on Google.  Like dead as they will get shot."

B. *Defense Case*

Zaczkiewicz testified in his own defense and told the following version of events.  Prior to February 2023, Zaczkiewicz and Alana were on friendly terms.  They did homework together and hung out once outside of class, and she sometimes gave him rides to the bus stop.  He was aware she had a boyfriend and denied making any romantic advances towards her before they spent the night at her mother's house.

Zaczkiewicz testified that Alana acted flirtatiously towards him on the night they went to her mother's house, so he thought it would be the "perfect move" to kiss her.  However, he sensed she did not enjoy the kiss.  He denied intentionally overstaying his welcome and claimed he was merely trying to arrange a ride from a friend.  He left around midnight and Alana was screaming at him when he left.

The next day, Zaczkiewicz was embarrassed that he had missed "the social cues that [he] had to leave," and claimed the prior night had been a "drunk mistake."  He texted Alana the next morning to apologize for his conduct at the house and for sending text messages to her after he left.  He continued texting her because his feelings were hurt, he knew he had messed up, and he could not control himself.  He did not deny sending any of the messages that were discussed at trial, but he did not remember sending all of

8

them either.  Specifically, he did not recall sending the message in which he threatened to slit her throat and throw her in a ditch.  He claimed he did not mean the things he wrote, he would never hurt her, and he did not own a weapon.  He also denied knowing she would be in Pacific Beach when he ran into her there.

Dr. Morgan Shaw, a clinical psychologist, testified for the defense. Dr. Shaw reviewed Zaczkiewicz's records, interviewed him, and administered tests to him.  She diagnosed him with schizoaffective disorder, borderline personality disorder, unspecified trauma- or stressor-related disorder, and multiple substance abuse disorders, including methamphetamine use disorder, cannabis use disorder, and alcohol use disorder.  When a person suffers from schizoaffective disorder, they meet the criteria for both schizophrenia and a major mood disorder, which in Zaczkiewicz's case was bipolar disorder.  Dr. Shaw opined that Zaczkiewicz exhibited signs of manic behavior, disinhibition, and paranoid and delusional thinking.

C. *Verdict and Sentencing*

After deliberations, the jury found Zaczkiewicz guilty of all three charges.  In a bifurcated proceeding, the trial court found true the three prior strike allegations and the two serious felony prior allegations.  The court also made true findings on the aggravating circumstance allegations.

Prior to sentencing, the defense filed a sentencing memorandum asking the court to strike two of the three prior strikes under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, stay the punishments for counts 2 and 3 pursuant to section 654, and strike the two serious felony priors.  The defense requested a prison sentence of 10 years.

In its sentencing memorandum, the prosecution opposed the defense's *Romero* motion, argued section 654 was inapplicable, and requested the

9

imposition of both serious felony priors. The prosecution sought a prison sentence of 50 years to life, plus 30 years.

At sentencing, the trial court granted the *Romero* motion and denied the defense's requests to strike the serious felony priors and stay the punishments for counts 2 and 3. The court imposed a second-strike prison sentence of 18 years 8 months, calculated as follows: six years for count 1 (the mid-term of three years, doubled), plus 16 months each for counts 2 and 3 (one-third the mid-term, doubled), plus ten years for the serious felony priors.

## III

## DISCUSSION

### A. *The Trial Court Properly Denied the Motion for Pretrial Diversion*

Zaczkiewicz contends the trial court abused its discretion by denying his motion for pretrial mental-health diversion. He claims the court erred because substantial evidence does not support the court's factual finding that he posed an unreasonable risk of danger to public safety. By contrast, the People argue that the court properly exercised its discretion to deny pretrial diversion because sufficient evidence supports the court's dangerousness finding. We agree with the People.

#### 1. *Additional Information*

Before trial, the defense filed a motion requesting pretrial diversion for the purpose of postponing the criminal proceedings and allowing Zaczkiewicz to undergo mental health treatment. Together with the pretrial diversion request, the defense filed a psychological evaluation and addendum prepared by a psychologist, Dr. Raymond Murphy. Dr. Murphy interviewed Zaczkiewicz, administered tests to him, and reviewed his police reports, detention records, and a behavioral health forensic psychiatry report finding

10

him competent to stand trial. The defense also submitted a diagnosis form from the County of San Diego Mental Health Services stating that Zaczkiewicz suffered from major depressive disorder, alcohol dependence, cannabis dependence, and cocaine dependence.

In his motion for pretrial diversion, Zaczkiewicz argued he suffered from several qualifying mental disorders recognized by the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), including delusional disorder, PTSD, alcohol use disorder, amphetamine use disorder, and major depressive disorder. He claimed his mental disorders played a significant factor in the commission of his offenses because he was experiencing a psychotic episode—namely, delusions with persecutory themes—at the time of the offenses. He asserted he would respond well to treatment; he consented to pretrial diversion; and he agreed to treatment as a condition of pretrial diversion. Further, he contended he did not pose an unreasonable risk of danger to public safety because he had no history of "carrying out any of [his] threats or committing other crimes of [a] violent nature."

Dr. Murphy's psychological evaluation provided a diagnostic impression that Zaczkiewicz suffered from delusional disorder with persecutory and grandiose themes, PTSD related to childhood trauma, alcohol use disorder, and amphetamine use disorder. Dr. Murphy described Zaczkiewicz as a "highly problematic gentleman [who] exhibits a rather difficult diagnostic picture," as he "appears very stable and well directed," but "when stimulated to exhibit his emotional distress, it is quite clear that Mr. Zaczkiewicz experiences problematic delusional functioning." Dr. Murphy observed that Zaczkiewicz exhibited delusional perception, suspicious persecution, anxiety,

11

and unusual thought content, as well as conceptual disorganization, grandiosity, and lack of judgment and insight.

Dr. Murphy opined that treatment intervention "may be quite problematic as it is unlikely that medication by itself will alleviate the delusional perceptions." Dr. Murphy also noted that Zaczkiewicz reported he had participated in several prior substance abuse rehabilitation programs and, with only one exception, he either did not graduate from the programs or did not find them helpful. Nonetheless, Dr. Murphy recommended that Zaczkiewicz participate in a "full spectrum therapeutic program," including psychiatric screening, medication supervision, substance abuse treatment, individual counseling, residential treatment, cognitive behavioral therapy, and treatment intervention dealing specifically with the effects of trauma.

As part of the psychological evaluation, Dr. Murphy administered the Historical Clinical and Risk Management 20 (HCR-20) test to Zaczkiewicz to assess his potential for aggressive or assaultive behavior. According to Dr. Murphy, Zaczkiewicz's score placed him in the "moderate range of risk," and "certainly indicate[d] that some potential for aggressive functioning may be related to his mental health issues ...." However, in an addendum to the psychological evaluation, Dr. Murphy opined there was "little likelihood" Zaczkiewicz would reoffend or commit a super strike offense if he fully participated in a rehabilitation program.

The prosecution opposed the defense's motion for pretrial diversion. It conceded Zaczkiewicz was eligible for diversion because he was diagnosed with two qualifying mental disorders (delusional disorder and PTSD), and at least one of his mental disorders was a significant factor in the commission of the charged offenses. However, the prosecution argued he was not suitable for diversion because he posed an unreasonable risk of danger to public

12

safety.  The prosecution claimed he presented a serious risk of danger to public safety due to the violent nature and duration of the threats he made against Alana and her son, his criminal history, and the escalating seriousness of his crimes.

According to the prosecution, Zaczkiewicz's criminal history included three prior strikes arising from two criminal cases.  He received his first strike after he placed demand notes on two vehicles stating he had installed bombs on the vehicles and would blow them up unless the owners paid him.  He also installed a fake bomb on one of the vehicles, which resulted in the deployment of a bomb squad.  The bomb squad determined the bomb was fake, though it included all the elements of a legitimate bomb.  Zaczkiewicz pleaded guilty to making a criminal threat and was placed on probation.

While Zaczkiewicz was on probation for his first strike, he committed his second and third strikes.  Zaczkiewicz incurred these strikes after he tried to enter the apartment of two college students he had met the prior evening.  He also sent the students several menacing and violence-filled text messages, including messages in which he threatened to murder the students, detonate a bomb, kill police officers, and "create a new world without peace." Zaczkiewicz was found guilty of two counts of making a criminal threat and sentenced to prison for six years four months.

After a hearing, the trial court denied the motion for pretrial diversion. Ruling from the bench, the court found Zaczkiewicz was unsuitable for pretrial diversion because he posed an unreasonable risk of danger to public safety.  In reaching this determination, the court emphasized Zaczkiewicz's "significant and serious criminal history," as well as the persistent and violent nature of the crimes charged in the present case.

13

2. *Legal Principles*

"In June 2018, the Legislature enacted Penal Code sections 1001.35 and 1001.36, which created a pretrial diversion program for certain defendants with mental health disorders." (*People v. Frahs* (2020) 9 Cal.5th 618, 624, citing Stats. 2018, ch. 34, § 24, fn. omitted.) " 'Pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment ...." (§ 1001.36, subd. (f)(1).) "If mental health diversion is granted and the defendant satisfactorily completes the court's approved mental health treatment program, then the defendant's criminal charges are required to be dismissed and the defendant's arrest on the charges 'shall be deemed never to have occurred.' " (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1078 (*Gerson*); § 1001.36, subd. (h).)

The stated purpose of the pretrial diversion program "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)–(c); see *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 887 (*Sarmiento*) [the program "was designed to encourage trial courts to broadly authorize pretrial mental health diversion, providing treatment for qualifying mental disorders that result in criminal behavior"].)

14

Section 1001.36, subdivision (b) sets forth two statutory criteria that must be satisfied for a defendant to be eligible for pretrial diversion. First, the defendant must be "diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders," subject to exclusions not pertinent here. (§ 1001.36, subd. (b)(1).) Second, the defendant's mental disorder must have been "a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(2).)

If the defendant satisfies these eligibility requirements, the trial court must then determine whether the defendant is suitable for pretrial diversion. (§ 1001.36, subd. (c).) A defendant is suitable for pretrial diversion if four criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial .... [¶] (3) The defendant agrees to comply with treatment as a condition of diversion .... [¶] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (*Id.*, subd. (c)(1)–(4).)

"If the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 134, quoting § 1001.36, subd. (f)(1); see *Sarmiento, supra*, 98 Cal.App.5th at p. 892 ["subdivision (f)(1) of section 1001.36 read as a whole appears to contemplate an ongoing assessment to assure that defendants will receive appropriate treatment for their particular conditions as part of the diversion program"].)

Even if the defendant satisfies the express statutory requirements for pretrial diversion, the trial court still retains residual discretion to deny diversion. (See § 1001.36, subd. (a) ["the court may, *in its discretion*, ... grant pretrial diversion"], italics added; *Gerson, supra*, 80 Cal.App.5th at p. 1080 ["diversion under section 1001.36 is discretionary, not mandatory, even if all the requirements are met"].) This " 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 892.) "Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Id.* at p. 893.)

An appellate court reviews a denial of pretrial diversion for abuse of discretion. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448–449 (*Moine*).) A court abuses its discretion when it renders a decision that is so irrational or arbitrary that no reasonable person could agree with it, applies the wrong legal standard, or bases its decision on factual findings that are not supported by substantial evidence. (*Lacour v. Superior Court* (2025) 110 Cal.App.5th 391, 402 (*Lacour*).) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Gerson, supra*, 80 Cal.App.5th at p. 1079.)

" 'When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citation.] In 'making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved

16

conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Lacour, supra*, 110 Cal.App.5th at pp. 401–402; see *Gerson, supra*, 80 Cal.App.5th at p. 1079 [" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' "].)

3. *Analysis*

Only one pretrial diversion criterion is at issue in this appeal—namely, whether the trial court erred in finding Zaczkiewicz posed an unreasonable risk of danger to public safety if he were treated in the community.

Under section 1001.36, an unreasonable risk of danger to public safety is " 'an unreasonable risk that the petitioner will commit a new violent [super strike].' (§ 1170.18, subd. (c).) Thus, a defendant is not suitable for diversion if the defendant is 'too dangerous to be treated in the community because he [or she] would commit a new violent super strike.' " (*People v. Graham* (2024) 102 Cal.App.5th 787, 798–799 (*Graham*).) Qualifying super strikes include homicide, attempted homicide, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, and certain sexual offenses against minors. (§ 667, subd. (e)(2)(C)(iv).) When determining whether a defendant poses an unreasonable risk of danger to public safety, the court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

17

Viewing the evidence in the light most favorable to the judgment, we conclude sufficient evidence supported the trial court's implied finding that Zaczkiewicz would be likely to commit a super strike if he were treated in the community. Zaczkiewicz was charged—and ultimately convicted—of threatening and stalking after he sent hundreds of messages to his victim over a prolonged timeframe, including violent and graphic death threats. He told the victim "[t]he universe [would] get rid of" her, and unnamed assailants were "going to kill" her. His threats became even more worrisome from there, as he told the victim she would "get murder[ed]," have her "throat slit," and "get thrown in a ditch," and he would kill her four-year-old son, "look into [her] eyes while [she] ble[d] out to death," and "kill [himself] in [her] presence." These threats culminated in a frightening incident where Zaczkiewicz accosted the victim in-person with two companions who, according to Zaczkiewicz, were armed with firearms. These circumstances supported the court's finding of an unreasonable risk of danger to public safety. (§ 1001.36, subd. (c)(4) [court may consider "current charged offense" in assessing risk to public safety]; *Graham, supra*, 102 Cal.App.5th at p. 799 [court properly denied diversion based "on the serious and violent nature of defendant's charged crimes and defendant's actions during the commission of those crimes"]; *People v. Bunas* (2022) 79 Cal.App.5th 840, 862 ["there is nothing in section 1001.36, with respect to either eligibility or suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion"].)

The trial court also stated that it relied on Zaczkiewicz's "significant and serious criminal history" to find him unsuitable for pretrial diversion. Before the events giving rise to this case, Zaczkiewicz suffered three prior

strikes arising out of two separate incidents. In the first incident, Zaczkiewicz placed demand notes on the vehicles of strangers, threatened to blow up the vehicles, and placed a fake bomb—which included all the elements of a real bomb—on one of the vehicles. In the second incident, Zaczkiewicz tried to enter the apartment of two college students he had recently met and then sent them death threats. As these incidents illustrate, Zaczkiewicz not only has a worrying history of making unprovoked death threats against strangers; he has also taken concrete steps—trying to break into an apartment and installing a fake bomb—that increased the risk of violence. Based on Zaczkiewicz's history of making death threats against strangers, the circumstances surrounding the making of those threats, and Zaczkiewicz's failure to rehabilitate after he sustained his prior strike convictions, the court could rationally infer there was an intolerably high risk Zaczkiewicz would make, and ultimately effectuate, violent threats if treated in the community.

Zaczkiewicz argues his criminal history and the charges in the current case do not support the court's finding of an unreasonable risk of danger because none of his crimes were super strikes. However, the pretrial diversion statute contains no requirement that a defendant must *already* have committed a super strike to pose an unreasonable risk of danger to public safety; rather, it mandates an assessment of the defendant's likelihood of committing such a crime *in the future* if treated in the community. Although his prior crimes were not themselves super strikes, the court could rationally find—based on the sustained nature of his threats, the increasing severity of the threats, and his recalcitrance—that Zaczkiewicz "could commit an even more serious, violent felony in the future, and therefore posed an unreasonable risk under section 1001.36, subdivision (c)(4)." (*People v.*

19

*Brown* (2024) 101 Cal.App.5th 113, 124; see *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [rejecting claim that a "court may only exercise its discretion to find an unreasonable risk to public safety when considering an offender who has previously committed a super strike offense"].)

Though it is barely discussed by the parties in their appellate briefs, we note that certain aspects of Dr. Murphy's psychological evaluation also supported the court's finding that Zaczkiewicz posed an unreasonable risk of danger to public safety. After administering the HCR-20 test, Dr. Murphy concluded there was a moderate risk Zaczkiewicz would engage in aggressive or assaultive behavior. He added that Zaczkiewicz's score on the HCR-20 showed "some potential for aggressive functioning." In an addendum, Dr. Murphy stated it was unlikely Zaczkiewicz would commit a super strike offense if he fully participated in a rehabilitation program. However, Dr. Murphy also opined that treatment intervention would be "problematic" for Zaczkiewicz because "it is unlikely that medication by itself will alleviate [his] delusional perceptions." Further, as Dr. Murphy noted in the psychological evaluation, Zaczkiewicz did not complete several prior substance abuse rehabilitation programs in which he was enrolled, thus casting serious doubt on his ability to complete rehabilitation programs in the future.

In arguing that the evidence was insufficient to support the trial court's finding of an unreasonable danger to public safety, Zaczkiewicz analogizes his case to *Moine*. In *Moine*, the defendant was charged with assault and making criminal threats based on his involvement in two separate incidents at the offices of medical care providers. (*Moine, supra*, 62 Cal.App.5th at p. 444.) In the first incident, the defendant got into a fistfight with another patient, and each fighter blamed the other for starting and escalating the

confrontation. (*Ibid.*) In the second incident, the defendant questioned certain medication he had been prescribed and became upset after his psychiatrist referral had not been approved. (*Ibid.*) Office staff claimed the defendant said he could get his gun from home, return to the office, and shoot them, while the defendant and his mother said the defendant merely advised the office staff members not to be rude to strangers because they could respond violently. (*Id.* at p. 445.) The trial court denied the defendant's motion for pretrial diversion, finding he posed an unreasonable risk of danger to public safety. (*Id.* at p. 443.) The Court of Appeal reversed, concluding the evidence was insufficient to support the trial court's factual finding. (*Id.* at p. 444.)

*Moine* does not compel a reversal in the present case. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." *(People v. Thomas* (1992) 2 Cal.4th 489, 516.) And here, several key facts differentiate this case from *Moine.* Unlike the defendant in *Moine,* who experienced a brief outburst of anger, Zaczkiewicz made numerous violent threats against the victim and her family that escalated in severity and persisted over many weeks. Further, the *Moine* defendant did not have any prior felony convictions, two psychiatrists found that he posed a low risk of committing a future assault, and the trial court itself had released the defendant into the community on bond for over two years. (*Id.* at pp. 450–451.) By contrast, Zaczkiewicz sustained three prior strike convictions for making death threats against strangers, Dr. Murphy opined that he is in the moderate range of risk for assaultive behavior, and Zaczkiewicz was kept in custody throughout his trial. These distinguishing facts support the trial court's finding that there

21

was an unreasonable risk that Zaczkiewicz would perpetrate a super strike, like homicide or attempted homicide, if he were treated in the community.

Zaczkiewicz also relies on *People v. Whitmill* (2022) 86 Cal.App.5th 1138, but that case is distinguishable as well. In *Whitmill*, the defendant suffered from PTSD and began to feel unwell while he was dropping his girlfriend off to visit with a friend. (*Id.* at p. 1142.) The friend approached the defendant to see what was wrong and the defendant, who seemed to be experiencing hypervigilance, warned the friend to stay away. (*Ibid.*) The defendant then fired a single shot into the air, ran away from the friend, discarded the firearm, and turned himself into law enforcement. (*Id.* at pp. 1442–1143.) The trial court denied the defendant's request for pretrial diversion on the ground he posed an unreasonable risk of danger to public safety, and the Court of Appeal reversed. (*Id.* at pp. 1146–1147.) In reversing the court's dangerousness finding, the Court of Appeal reasoned the defendant's conduct—warning the friend, running away, discarding his firearm, and turning himself in—showed he had "presence of mind" about his mental illness, and "indicate[d] a likelihood that appellant would *not* commit a super strike." (*Id.* at p. 1153, italics added.) In contrast to the *Whitmill* defendant, Zaczkiewicz took no protective measures to safeguard others.

On the contrary, Zaczkiewicz repeatedly sent graphic death threats to his victim and accosted her in person—merely the latest episode in his history of making violent and disturbing threats against others. Viewing the evidence in the light most favorable to the judgment of conviction, we conclude substantial evidence supported the court's finding that Zaczkiewicz posed an unreasonable risk of danger to public safety. Because Zaczkiewicz does not challenge the court's pretrial diversion ruling on any other basis, we

22

decline his request to reverse the judgment and remand the matter for further mental-health diversion proceedings.

B. *Section 654 Prohibited Multiple Punishments for Counts 2 and 3*

At sentencing, the trial court imposed consecutive prison terms of six years for the felony stalking conviction (count 1) and 16 months for each of the two criminal threats convictions (counts 2 and 3). On appeal, Zaczkiewicz claims section 654 required the court to stay punishment for two of his three convictions because they all arose from the same physical act or, alternatively, he harbored a single criminal objective—to harass Alana. The People, on the other hand, contend separate punishments were warranted for each of the three convictions.

1. *Legal Principles*

Section 654 states, in relevant part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

"[S]ection 654 protects against multiple punishment, not multiple conviction." (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "To avoid double punishment, a sentencing court applying section 654 will impose the sentence for one offense while staying the imposition of the sentence on the other offense." (*People v. Mathis* (2025) 111 Cal.App.5th 359, 367 (*Mathis*).)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished

23

more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312; see also *Mathis, supra*, 111 Cal.App.5th at p. 367 ["Under section 654, a defendant may not receive more than one punishment for a single act, nor may a defendant receive multiple punishments for acts that comprised a single, indivisible course of conduct in service of a single objective."].)

" 'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.' [Citation.] The court's express or implied findings in support of its determination that section 654 does not apply will be upheld on appeal if substantial evidence supports them." (*People v. Cruz* (2020) 46 Cal.App.5th 715, 737 (*Cruz*).) Meanwhile, the applicability of section 654 to settled facts presents a question of law. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

2. *Section 654 Did Not Require the Court to Stay the Punishments for Either the Stalking Conviction or the Criminal Threat Convictions*

Zaczkiewicz claims the trial court violated section 654 by failing to stay *either* the punishment for his stalking conviction *or* the punishments for his criminal threat convictions because the jury might have based its stalking verdict on the same acts giving rise to the criminal threat convictions— specifically, his sending of text messages to Alana on March 17.[5] According

---

[5]    The first set of text messages stated, "You['re] gonna get your throat sl[i]t and thrown in a ditch if you ever step foot on that campus again[]. [¶] You will get murder[]. [¶] Dead fucking serious."

The second set of text messages stated, "I can't wait until I look into your eyes while you bleed out to death[.] [¶] This is your fucking fault and I'll make you suffer. I'll even kill your son if I have to[]. [¶] This [is] Mike [by the way]. [¶] You['re] gonna die next week and that's for a fact[.]"

to Zaczkiewicz, the same physical acts may have formed the basis for the convictions because the jury was not asked on the verdict forms to identify which specific act(s) constituted stalking.

The criminal statute prohibiting stalking provides, "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for their safety, or the safety of their immediate family, is guilty of the crime of stalking ...." (§ 646.9, subd. (a).)

In the present case, the prosecution proceeded under the theory that Zaczkiewicz stalked Alana by willfully and maliciously harassing her and making a criminal threat against her or her son. The second amended information alleged he stalked her between February 27 (the night he kissed her at her mother's house) and March 28 (the day he accosted her in public). During closing arguments, the prosecution argued to the jury that it could convict Zaczkiewicz of stalking based on any "two or more" of the texts, phone calls, or e-mails he made or sent during this timeframe. The prosecutor then highlighted several of the troubling messages Zaczkiewicz sent in this timespan, including—but not limited to—the two text messages he sent on March 17.

On this record, we conclude the trial court rationally found that section 654 did not preclude separate punishments for the stalking conviction, on the one hand, and the criminal threats convictions, on the other hand. "[W]here there *is* a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339 (*McCoy*), italics added.) However, "in the absence of some circumstance 'foreclosing' its sentencing discretion ... a trial court may base its decision under section 654 on *any* of the facts that are in

25

evidence at trial, without regard to the verdicts." (*Id.* at p. 1340.) Indeed, "a court may even rely on facts underlying verdicts of *acquittal* in making sentencing choices." (*Ibid.*)

Here, there was ample evidence to support the court's implied finding that the stalking conviction was based on acts *other than* the sending of text messages on March 17. As noted, Zaczkiewicz called Alana and sent her a myriad of troubling messages, separate and apart from the text messages he sent on March 17. Because any number of these threatening communications were adequate to support the harassment and credible threat elements of the stalking charge, and there is no basis to conclude the stalking conviction was necessarily based on the March 17 text messages, the court properly imposed separate punishments for the stalking and criminal threats convictions. (See *Cruz, supra*, 46 Cal.App.5th at pp. 737–738 [section 654 inapplicable where evidence supported finding that defendant's stalking, protective order violations, and criminal threats convictions were based on separate acts]; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 90–91 [rejecting claim that section 654 precluded multiple punishments for conspiracy and furnishing controlled substance convictions where furnishing of controlled substance was one of several overt acts offered to prove conspiracy charge], reversed in part on other grounds by __ Cal.5th __ [2025 Cal. Lexis 8402]; *McCoy, supra*, 208 Cal.App.4th at pp. 1337–1340 [affirming separate punishments for burglary and restraining order violation convictions based on evidence that defendant arrived at victim's apartment two separate times, despite the lack of any jury finding that "resolved the question of which of the two possibly separate arrivals were the basis for its [protective order] verdict"].)

3. *Section 654 Required the Court to Stay the Punishment for One of the Two Criminal Threat Convictions (Count 2 or Count 3)*

Zaczkiewicz also claims section 654 required the trial court *either* to stay the punishments for the stalking conviction (count 1) *and* one of the two criminal threat convictions (count 2 or count 3), *or* to stay the punishments for *both* criminal threat convictions (counts 2 and 3), because all three offenses comprised a single, indivisible course of conduct incident to the same criminal objective—to harass Alana.

As a general matter, "[w]hether a course of conduct is divisible for purposes of section 654 depends on the intent and objective of the defendant. [Citation.] If multiple offenses ' "were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*People v. Fuentes* (2022) 78 Cal.App.5th 670, 680 (*Fuentes*).)

However, " 'a [course] of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.' " (*Fuentes, supra,* 78 Cal.App.5th at p. 680; see also *People v. Gaynor* (2019) 42 Cal.App.5th 794, 800 ["even if a course of conduct is ' "directed to one objective," ' it may ' "give rise to multiple violations and punishment" ' if it is ' "divisible in time" ' "]; *People v. Goode* (2015) 243 Cal.App.4th 484, 492 (*Goode*) ["If the offenses were committed on different occasions, they may be punished separately."].) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935; see *People v. Louie* (2012) 203 Cal.App.4th 388, 399 ["If the separation in time afforded [the] defendant[] an opportunity to reflect and to renew [the defendant's] intent before committing the next crime, a new and separate crime is committed."].)

27

On the record before us, we conclude there was sufficient evidence to support the court's implied finding that Zaczkiewicz's course of conduct was divisible due to the temporal separation between the acts on which the stalking conviction was based, on the one hand, and the acts on which the convictions for making criminal threats were based, on the other hand. There was substantial evidence Zaczkiewicz perpetrated the acts giving rise to the stalking conviction as early as March 10 (when he messaged Alana he hoped God would "take[] [her] off this planet," the universe would "get rid of [her] gray-haired ugly ass," and he hoped she would die) and March 11 (when he messaged her that unnamed persons were "going to kill" her). Those acts occurred six and seven days before he sent the text messages giving rise to the convictions for making criminal threats on March 17. Given this temporal separation, the court could rationally infer Zaczkiewicz had sufficient time to reflect and renew his intent to harass Alana, his course of conduct was divisible, and section 654 was therefore inapplicable. (See *Cruz, supra*, 46 Cal.App.5th at p. 738 [acts composing course of conduct in case involving stalking and criminal threats "were divisible in time because they occurred on separate days"].)

However, we agree with Zaczkiewicz that section 654 required the court to stay the punishment for one of his two criminal threat convictions. It is evident Zaczkiewicz entertained the same criminal objective when he sent the text messages giving rise to both convictions—to harass Alana for spurning his romantic advances. Indeed, the People do not contend otherwise on appeal. Further, the record is devoid of any evidence suggesting that Zaczkiewicz had sufficient time to reflect and renew his intent between his act of sending the first set of text messages giving rise to count 2 and his act of sending the second set of text messages giving rise to count 3. On the

28

contrary, screenshots of the text messages taken from Alana's phone show he sent all the text messages on the same day (March 17, 2023) within one minute of each other (at 7:39 a.m.). Moreover, the People do not point to any evidence suggesting that Zaczkiewicz's act of sending the second set of text messages mere seconds after he sent the first set of text messages created a new or elevated risk of harm to Alana. Therefore, we conclude section 654 barred the imposition of punishment for one of the two criminal threat convictions. (See *Goode, supra*, 243 Cal.App.4th at p. 493 ["As a matter of law, we conclude the lapse of a few seconds between the two acts was not sufficient to make defendant's course of conduct divisible in time, such that he could be punished separately for each act."].)

In its present form, section 654 permits a court to stay the punishment for either conviction to which it applies, regardless of which punishment is more severe. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379 ["Penal Code section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence"].) However, in this case, the court imposed the same 16-month punishment for both criminal threat convictions, and it makes no difference whether the punishment is stayed for count 2 or count 3. Therefore, we stay the sentence for count 3 and affirm the judgment as modified, without remanding the matter for resentencing. (See *People v. Bey* (2025) 108 Cal.App.5th 144, 167.)

## IV

## DISPOSITION

The judgment is modified to stay the sentence for count 3 pursuant to Penal Code section 654. The trial court is directed to prepare an amended

29

abstract of judgment reflecting this modification and forward a certified copy to the Department of Corrections and Rehabilitation.  As modified, the judgement is affirmed.

McCONNELL, P. J.

WE CONCUR:


BUCHANAN, J.


KELETY, J.

30